**FOREMOST COUNTY MUTUAL INSURANCE COMPANY, Plaintiff–Appellee,**

v.

**The HOME INDEMNITY COMPANY, Defendant–Appellant.**

No. 89–2323.

United States Court of Appeals, Fifth Circuit.

March 21, 1990.

Rehearing and Rehearing En Banc Denied May 3, 1990.

Donald M. Hudgins, Hudgins, Hudgins & Warrick, Houston, Tex., for defendant-appellant.

Kent C. Sullivan, Shelley Rogers, Cook, Davis & McFall, Houston, Tex., for plaintiff-appellee.

Before GEE, JONES, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Home Indemnity Company ("Home") appeals from a summary judgment in a declaratory action brought by Foremost County Mutual Insurance Company ("Foremost"). The district court held that Foremost's insured was also covered by Home's policy and that as a consequence Foremost was entitled to subrogation against Home for half of the $3,200,000 Foremost paid in settlement of claims related to, or arising under, the liability insurance policy covering Foremost's insured. We reverse and render.

### Facts.

Eli J. Butler and his company, Paradise Investment Corporation, held a general liability policy issued by Home and an automobile liability and physical damage policy issued by Foremost, each with a $250,000 limit. The estate of Mario Porcayo sued Butler after Porcayo was killed when struck by a motorhome which Butler was driving. Foremost refused to defend Butler, claiming non-coverage (Later Foremost admitted coverage.). Home tendered a defense to Butler under its workers' compensation policy but did not indicate to Butler that there might be liability coverage under its general policy. Both Home and Foremost refused settlement offers within their policy limits.

Immediately prior to trial, a covenant not to execute (drafted by Home's lawyers) was signed; the Porcayos agreed not to execute against Butler, and Butler assigned to the Porcayos any rights he might have against Foremost (including his claim for wrongful refusal to defend). At trial, Home did not question the Porcayos' witnesses. Final judgment was rendered against Butler by the court (Home did not request a jury trial.) in the amount of $3,797,000.

Shortly thereafter, Foremost settled its claims with the Porcayos for $3,200,000. Foremost then sought, in a declaratory judgment action, subrogation or contribution from Home. That claim was based upon the fact that Home was a co-insurer, since Butler was a named insured on Home's policy even if the motorhome he was driving at the time of the accident was not on Home's schedule of automobiles under the policy.

The insurers filed cross-motions for summary judgment; the district court granted Foremost's and denied Home's. The court found that Butler was covered under Home's policy, and thus Home was liable as a co-insurer. The district court then ordered that Home pay half of Foremost's $3,200,000 settlement, reasoning that Home could be held liable for amounts in excess of its policy limits based upon its earlier refusal of the settlement offer within policy limits.

### Discussion.

#### I.

■ We first address the question of whether Home's policy covered Butler for his liability arising from the automobile accident in which, while driving his vehicle, Butler accidentally killed Porcayo. Butler was a named insured on the policy, but his vehicle was not listed under the "schedule of automobiles" in Home's policy. Home's general liability policy includes the explicit statement, "The company will pay on behalf of the insured all sums which the insured should become legally obligated to pay as damages because of (c) bodily injury or (d) property damage to which this insurance applies, caused by an occurrence and arising out of the ownership, maintenance or use ... *of any automobile* ..." (emphasis added). Home's policy also defines "persons insured," stating, "Each of the following is an insured under this insurance to the extent set forth below: a) the

named insured; b) any partner...." Butler was listed by endorsement as a named insured under the policy.

Notwithstanding these seemingly unambiguous statements indicating that Home would pay any liability of Butler's arising from his use of any automobile, Home argues that the policy, when read as a whole, suggests that only those automobiles listed under the schedule of automobiles are covered. To the extent that Home did determine its rates as indicated in the schedules, examination of the schedules confirms Home's statement that a separate premium was paid for each automobile listed under the schedule of Paradise's automobiles. Therefore, it is indeed possible that Butler and Paradise were not paying the premium which Home would have demanded had it intended to cover the vehicle at issue.[1]

Under Texas law, which governs this diversity action, it "is a fundamental rule that the writing will be construed most strictly against the party who drafted it." *Ellis v. Mortgage & Trust, Inc.*, 751 S.W.2d 721, 723 (Tex.App.—Fort Worth 1988, no writ). Home, of course, is the drafter of the policy here. Also in general under Texas law, where language in an insurance policy is susceptible of more than one construction, such policies must be construed strictly against the insurer and liberally in favor of the insured. *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 666 (Tex.1987). Therefore, "any automobile" should be interpreted literally; if Home wanted to limit coverage to owned automobiles that were listed on the schedule, it could have included this provision simply by saying, "any scheduled automobile, hired automobile, or non-owned automobile, as defined in the policy" instead of "any automobile."

Furthermore, Home's premium schedules would suggest, at most, that an automobile must be listed on the schedule in order to

---

**1.** Home argues that, by looking to the phrase "to which this insurance applies," use of "any automobile" in the policy can be reconciled with Home's contention that only those automobiles on the schedule are covered. Home's position, though, that "to which this insurance applies" somehow modifies "any automobile" is untenable. The structure of the sentence leaves little doubt that "to which this insurance applies" modifies "bodily injury or property damage," not "automobile."

be classified as an "owned automobile,"[2] not that automobiles must be listed on the schedule as an absolute prerequisite to any coverage for that automobile's driver. Indeed, coverage for many of the insureds under the policy is qualified by the type of automobile being used, limited in some cases to "owned automobiles" and in other cases extending to "hired automobiles" or "non-owned automobiles." Coverage to the named insured, on the other hand, is unqualified. Butler, as a named insured, is thus afforded coverage as to all automobiles. Hence, we conclude that the district court did not err in finding coverage for Butler under Home's policy.

## II.

Foremost claims that as a co-insurer Home is liable for half of the $3,200,000 Foremost paid in settlement to the Porcayos. However, the limit of both the Foremost policy and the Home policy was only $250,000. Foremost argues, and the district court held, that Home can be liable for amounts in excess of its policy limit based upon the "*Stowers* doctrine" of Texas insurance law, which arises from *G.A. Stowers Furniture Co. v. American Indem. Co.*, 15 S.W.2d 544 (Tex. Comm'n App.1929, holding approved).

In *Conoco, Inc. v. Republic Ins. Co.*, 819 F.2d 120, 123 n. 4 (5th Cir.1987), we described the *Stowers* doctrine as allowing

> an insured to recover damages from his insurer for the insurer's failure to settle a claim against the insured within the policy limits. Where the insurance policy gives the insurer complete control of the litigation, the Stowers Doctrine protects the insured in certain circumstances from having to pay a judgment greater than the policy amount if the insurance company previously spurned a settlement offer for less than or equal to the policy

amount. The insured's cause of action, however, did not arise under the original doctrine until he had actually paid part of the judgment in excess of the policy limits.

In the instant case Foremost and Home did each refuse a settlement offer within its policy limits prior to the agreement on the covenant not to execute and prior to trial. However, the *Stowers* doctrine applies only "in certain circumstances." *Id.* *Stowers* itself suggests, and subsequent cases have held, that among the conditions necessary for application of the doctrine should be negligent or bad-faith conduct by the insurer. *See Stowers*, 15 S.W.2d at 545; *Highway Ins. Underwriters v. Lufkin–Beaumont Motor Coaches*, 215 S.W.2d 904, 927–28 (Tex.Civ.App.—Beaumont 1948, no writ); *Whatley v. City of Dallas*, 758 S.W.2d 301, 308–09 (Tex.App.—Dallas 1988, writ denied). It is doubtful that negligence or bad faith was established in the instant case, but we need not consider this matter further, as we hold, for independent reasons, that the *Stowers* doctrine does not apply to the case at bar.

## A.

The crux of the *Stowers* claim is negligence or bad faith by the insurer directed against the insured. Home's refusal to accept a settlement offer does not, without more, give rise to a *Stowers* cause of action; there must be not only negligent refusal to settle by the insurer but also subsequent harm to the insured.[3] *See Hernandez v. Great Am. Ins. Co.*, 464 S.W.2d 91, 94 (Tex.1971).

The covenant not to execute, drafted by Home's lawyers, released Home's insured from all legal obligations to pay. Thus, Home's decision to reject the settlement offer never resulted in any injury to its

---

**2.** This is itself an unlikely proposition, as the policy's definition of "owned automobile" is "an automobile owned by the named insured," not an automobile listed on the schedule. By comparison, Foremost's policy defines "owned automobile" as "(a) an automobile which is owned by the named insured and described in the declarations; or...."

**3.** That is, in *Stowers* cases the decision of the insurer to refuse settlement is examined *ex post* for liability rather than *ex ante*. It is, of course, consistent with general tort doctrine to the effect that negligent acts alone are not sufficient to give rise to liability; damages must follow in addition.

insured.[4] Hence, Home did not breach its *Stowers* duty to its insured [5] and therefore has no obligation to the Porcayos beyond those limited obligations that might have arisen directly under the policy.

### B.

Foremost argues, though, that the fact that Butler paid nothing should be disregarded because it occurred by operation of a covenant not to execute. In Texas a covenant not to execute by an insured does not release an insurance carrier from liability. *See Young Men's Christian Ass'n v. Commercial Standard Ins. Co.* ("*YMCA*"), 552 S.W.2d 497, 504–05 (Tex. Civ.App.—Fort Worth 1977), *writ ref'd n.r.e.*, 563 S.W.2d 246 (Tex.1978) (per curiam). Thus, it might be argued that Home's refusal to settle led to a $3,797,000 judgment against Butler that, if Home were found to have acted negligently or in bad faith, would have given rise to a *Stowers* claim in Butler against Home but for the existence of the covenant not to execute. Therefore, given the Texas law that a covenant not to execute does not release an insurer from liability, one could argue that upon entry of judgment, the Porcayos, by assignment from Butler through the covenant not to execute, held a *Stowers* claim against Home.

There are, however, two problems with this theory. First, there was no assignment by Butler of any claims Butler might have against Home, but only of claims against Foremost. Such an assignment of a *Stowers* claim appears to be necessary to Foremost's position. In *Whatley* the court stated, "A [*Stowers*] claim that an insurer negligently failed to settle an injured party's action against an insured belongs to the insured and the injured party has no standing to assert it" (citing several Texas cases). *Whatley* further concluded that where the claim had not been assigned by the insured to the injured party, the injured party did not own that claim.[6]

Second, extending the *Stowers* doctrine to this case on a basis of the assignment and covenant not to execute does not serve

4. Foremost asserted for the first time at oral argument that the covenant not to execute did not fully protect Butler from injury because the judgment against him would result in increased future insurance rates and would have to be shown on any of his future financial statements as an unsatisfied liability. However, in *Whatley* the court, in evaluating injury to a defendant protected by a covenant not to execute, said simply, "If the judgment cannot be enforced against the insured, no such injury exists." While *Whatley*'s holding (which barred a claim against an insurer for damages in excess of policy limits where its insured was protected by a covenant not to execute) was limited to situations in which the insurer did not act negligently or in bad faith, the determination of damage to the insured is independent of those limitations, so the quoted statement reasonably applies to the instant case.

5. We also hold that Home had no duty to Foremost under the *Stowers* doctrine. That doctrine has been directed to protection of the insured where the insurer is in complete control of the litigation; there does not appear to be sufficient reason for extending it to protect other insurers in co-insurer situation. Home *was* in complete control of the litigation here, but this was a direct consequence of Foremost's decision not to provide a defense to its insurer.

Moreover, Foremost itself also rejected the settlement offer. The raison d'etre for the *Stowers* doctrine is that the insurer, when in control of the litigation, might refuse a settlement offer that its client, the insured, would want to accept if it had the option. In this case, Home's control of the litigation and refusal to settle did not deny Foremost the ability to settle, since Foremost had an independent offer of settlement (which it refused).

Furthermore, the insurer generally has a contractual duty to defend its insured and specifically did so under the policies in *Stowers* and *Conoco,* which is the reason the insurer controls the litigation. Home had no such contractual duty to defend Foremost. Moreover, the insurer's contractual duty to defend its insured against liability arises under the policy. Here, though, the potential excess liability of Foremost arises not under the policy itself (because there Foremost was limited to the same $250,000 as was Home), but instead from a wrongful refusal to defend, an independent action that obviously was not covered in Home's policy.

6. The equities in this case arguably militate against this result, as Home had not informed Butler of the existence of possible coverage under its policy at the time. However, Butler should be aware of his own policy and should have considered that it is generally the insured's duty to make a claim against the insurer. Moreover, Home appears to have had reasonable, although not correct, grounds for believing that coverage did not apply.

the policy the courts were attempting to advance in *YMCA* when they created the rule that a covenant not to execute does not relieve the insurer of liability. The purpose of the rule in *YMCA* was to prevent an insurer from escaping liability by treating the policy as one of indemnity rather than liability. *See YMCA*, 552 S.W.2d at 504. In *YMCA*, following a judgment against the insured, an injured party sought damages, in accordance with Texas law, directly from the insurer under a third-party beneficiary theory. The insurer argued, however, that it was not obligated to pay an injured party who had covenanted not to execute against the insured because the covenant insulated the insured from liability, and without liability the insured had no claim to coverage. The court held, though, that the insured's *liability* attached with the judgment; whether the insured paid it was immaterial.

The *YMCA* rule should not be extended to the *Stowers* claim in the instant case. We hold that since Home provided a defense to its insured that ultimately resulted in no injury to its insured, the possible rationales for the *YMCA* rule that arise where an insurer refuses to defend do not apply here.[7]

The insurance company's liability for a standard claim under the policy, as in *YMCA*, arises from a tort by the insured directed against a third party for which the insured is liable. In such a situation, the *YMCA* rule is needed to protect the insured adequately. Where the insurer refuses to tender a defense, the insured often can protect himself only with a covenant not to execute. *See Whatley*, 758 S.W.2d at 310. Without such a covenant, the insured either would have to pay the plaintiffs enough to settle their claim or would have to incur defense costs himself, even though the insurer is contractually responsible for payment of such costs. Were a covenant not

to execute to absolve the insurer of liability, plaintiffs would have no incentive to enter into such a covenant.

With regard to *Stowers* damages,[8] the insured does not need the benefit of the *YMCA* rule where the insurer in question, rather than refusing to defend and ignoring its insured, has actively participated in drafting the covenant not to execute that protects its insured. Here, not only does the insured not incur defense costs, but failing to apply the *YMCA* rule will not improperly chill incentives to covenant not to execute. The insured will still have at its disposal all of its legitimate claims (not the *Stowers* claim because there was no injury) to offer to plaintiff in order to induce plaintiff to covenant not to execute. The only party adversely affected by the enforceability of the covenant not to execute in this case is Foremost, but Home had no contractual duty to Foremost, and thus Foremost has no right to any *Stowers* damages from Home. Hence, an insurer does not escape its *contractual* obligations with a covenant not to execute, but a successful covenant not to execute prevents any injury that could give rise to a *Stowers* claim.

Under the holding of this case, the insurer is relieved of its liability for a negligent refusal to settle only where it defends its insured and succeeds in obtaining protection for its insured from all liability. Because this release can come only with the approval of the injured plaintiff, not extending the *YMCA* rule to the instant case would not generally encourage negligent refusals to settle. Even in the case of a settlement offer at the policy limit, where the interests of insurer and insured in settling would be the most divergent (in the absence of a fully enforceable *Stowers* rule), the insurer will face the same risk by not settling which it normally would con-

7. We do not decide the more general question posed by the court in *Whatley* of "whether a judgment creditor may recover against an insurer damages awarded against its insured in excess of policy limits for which the insured is not personally liable if the insurer has acted negligently or in bad faith." *Whatley*, 758 S.W.2d at 310 n. 6.

8. The *YMCA* rule will still prevent Home from asserting the existence of a covenant not to execute as a basis for avoiding liability *within its policy limits. See Whatley*, 758 S.W.2d at 309–10.

front under *Stowers*, regardless of whether the *YMCA* rule is extended to the instant case.

Whether the *YMCA* rule is applied is material only where there is a covenant not to execute. If no covenant not to execute is forthcoming, the insurer will be responsible for the entire judgment, including any excess over the policy limits, and plaintiff will be aware of this. Thus, in order to induce the plaintiff to enter a covenant not to execute, the insurer must *either* accept an admission of liability (which is effectively equivalent to a settlement) *or* permit itself to be exposed to damages in excess of policy limits (which returns the insurer to the *Stowers* situation).

Therefore, under our decision not to extend the *YMCA* rule the insurer who negligently refuses to settle will be able to use a covenant not to execute only to the disadvantage of another insurer that has breached its duty to the insured (as in the instant case) and not to the disadvantage of its insured. Moreover, because we rely upon the fact that the insurer provided a defense to its insured, we have not created a vehicle by which insurers can easily simultaneously challenge coverage and avoid any possibility of liability beyond policy limits.[9]

## III.

■ Having concluded that Home's potential liability is limited to that specified by its policy, we now examine the issue of subrogation. The judgment at trial was $3,797,000. Foremost settled for $3,200,-000, even though the limit of its policy was only $250,000. We infer that Foremost's payment of $2,950,000 in excess of policy limits reasonably must have been to settle some potential claims other than those arising directly under the policy.[10]

The assignment from Butler to the Porcayos explicitly sets forth the assignment of the wrongful-refusal-to-defend claim, and this presumably would be the major reason Foremost settled for such a large amount. In fact, the Porcayos had threatened Foremost with such a lawsuit. Indeed, under *Blakely v. American Employers Ins. Co.*, 424 F.2d 728 (5th Cir.1970), Foremost might be held liable for the entire amount of the judgment ($3,797,000) for having wrongfully refused to defend.

Home's potential liability can also be separated into two categories: (1) liability under the policy, which is limited to $250,000, and (2) liability under a *Stowers* claim, which is not so limited. Above we have concluded that Butler was covered under Home's policy and that Home's liability is limited to the policy maximum of $250,000. Given these conclusions, together with the rule from *YMCA* that a covenant not to execute does not relieve an insurer of liability for claims under the policy, it follows that upon entry of the $3,797,000 judgment, Home should have been liable for only $250,000.

The "indemnity" section of the Foremost–Porcayos settlement agreement reveals that the parties were aware, at the time of settlement, of Home's potential liability to the Porcayos. Foremost settled not only the $250,000 it owed under its liability policy but also the potential claims against it for wrongful refusal to defend. Foremost paid $3,200,000 to the Porcayos in return for the Porcayos' release of Foremost and any of its assigns or insureds, including Butler, from all liability. Because any liability of Home to the Porcayos

**9.** Normally in Texas, when an insurer defends its insured without a non-waiver agreement or a reservation of rights, it waives the right to challenge coverage. *See Pacific Indem. Co. v. Acel Delivery Serv., Inc.*, 485 F.2d 1169, 1173 (5th Cir.1973), *cert. denied*, 415 U.S. 921, 94 S.Ct. 1422, 39 L.Ed.2d 476 (1974). The instant case presents an unusual situation, as Home had tendered a defense under only one of two of its policies held by its insured. We do not address whether waiver occurred in this case.

**10.** In his affidavit, Farrell, a representative of Foremost, stated that the $3,200,000 was paid "to settle Mr. Butler's liability to the Porcayos by virtue of the final judgment." The $3,200,-000 payment indeed may have had the effect of settling Butler's liability, but Foremost fails to provide any reason why it would want to settle Butler's liability for $3,200,000 where its legal obligation was, under its policy, limited to $250,000 and Butler, Foremost's client, was already insulated from execution by the covenant with the Porcayos.

necessarily would be derived through Butler, this release effectively absolved Home of any liability as well.[11]

Interpreting Texas law, we have held, "It is clear that there are two kinds of subrogation: (1) legal or equitable, and (2) conventional. The first arises by operation of law and the second by contract or agreement." *Millers Mut. Fire Ins. Co. v. Farmers Elevator Mut. Ins. Co.*, 408 F.2d 776, 778 (5th Cir.1969) (citing *Commercial Standard Ins. Co. v. American Employers Ins. Co.*, 209 F.2d 60 (6th Cir.1954)).[12] The former kind of subrogation "is applicable when one person, acting involuntarily, has paid a debt for which another was primarily liable, unjustly enriching the latter." *Godwin v. Pate*, 667 S.W.2d 201, 203 (Tex.App.—Dallas 1983, writ ref'd n.r.e.) (citing *Smart v. Tower Land & Inv. Co.*, 597 S.W.2d 333, 337 (Tex.1980)).

The Foremost–Porcayos settlement did have the effect of extinguishing all of Foremost's and Home's debts. Thus, Foremost did in fact pay for a debt for which Home was primarily liable, and Home would be unjustly enriched thereby. At the time of payment, the amount of Home's debt was, of course, contingent upon a finding of coverage,[13] but this does not bar recovery by Foremost. *See Employers Casualty Co. v. Transport Ins. Co.*, 444 S.W.2d 606 (Tex.1969).

Foremost's policy contains a subrogation clause identical to that of the insurer in *Employers*, and this provides Foremost with a valid basis for contractual subrogation. Foremost was potentially liable to the Porcayos on behalf of Butler, its insured, for the full judgment, and it may have been difficult to effect only a partial settlement of the claims between Butler and the Porcayos. Under such circumstances, where Foremost has a *contractual* subrogation right, it might not be a volunteer.

In *Southwestern Indem. Co. v. National Sur. Corp.*, 277 F.2d 545 (5th Cir.1960), we allowed, by contractual subrogation under Texas law, one settling insurer to recover against another that had not settled or defended. We stated, "National could not well settle the Hadley and Beard claims piecemeal. It was not a mere volunteer in paying more than its proportionate part of the liability. That excess was paid on behalf of the insured Schwope, and National became subrogated to Schwope's right against Southwestern and Service Mutual." *Id.* at 549. *See also Liberty Mut. Ins. Co. v. General Ins. Corp.*, 517 S.W.2d 791, 798 (Tex.Civ.App.—Tyler 1974, writ ref'd n.r.e.).

Moreover, the Texas Supreme Court has held that where the subrogation is conventional, contractual subrogation, it is immaterial whether the subrogee's payment of more than its pro rata part of the loss was compulsory or involuntary. *See Employers*, 444 S.W.2d at 610. Both *Southwestern Indemn. Co.* and *Employers*, though, involved insurer-subrogees that, while paying more than their pro rata share of the loss, did not pay more than their policy limits.

The subrogation clause in Foremost's policy reads,

> In the event of any payment under this policy, the company shall be subrogated to all the insured's rights of recovery therefor against any person or organization and the insured shall execute and

---

11. We note that this release is unlike a covenant not to execute in that the former actually eliminates any liability of the potential defendants, not merely their obligation to pay. The record includes a letter from the Porcayos threatening to sue Home for the "remaining" $597,000 on the judgment, but the terms of the settlement are unambiguous, and without any conflicting agreement in the record we must hold that the Porcayos have settled all of their claims. Therefore, the Porcayos forfeited their right to recover any more than the $3,200,000 on their $3,797,000 judgment.

12. It may be said that usually when the term "subrogation" is used alone, legal or equitable subrogation is meant, rather than conventional subrogation. *Commercial Standard*, 209 F.2d at 64.

13. At the entry of judgment, both the liability of Home and that of Foremost were conditional, Home's on a finding of coverage and Foremost's on the legal determination that a court would find, under *Blakely*, that Foremost would be liable for the full $3,797,000. Therefore, the Porcayos would have reason to settle for somewhat less than their potential liability with each insurer.

deliver instruments and papers and do whatever else is necessary to secure such rights. The insured shall do nothing after loss to prejudice such rights.

It is uncertain whether a payment beyond policy limits, even if arising from coverage of the policy, can constitute a "payment under this policy." Unless the contract indicates otherwise contractual subrogation is examined within the framework of the doctrine of equitable subrogation and is subject to conformity with its principles. *See Commercial Standard Ins. Co. v. American Employers Ins. Co.*, 209 F.2d at 64–66. "In conventional subrogation, the extent of the right is measured by the agreement for subrogation; equity will determine the rights of the parties by the contract, enforce the agreement, and give the second or substituted creditor what he contracted for." *Id.* at 65.

In a case such as the instant one, where the contract does not speak pellucidly to how payments should be allocated, the tenets of the doctrine of equitable subrogation should provide us with guidance. Hence we turn to equitable subrogation principles and again face the question of whether any of Foremost's payments pursuant to coverage under the policy for amounts over $250,000 were those of a volunteer.[14]

Under equitable subrogation, "If a person has any palpable interest which will be protected by the extinguishment of the debt, he may pay the debt and be entitled to hold and enforce it just as the creditor could." *Commercial Standard*, 209 F.2d at 64. Thus we consider whether Foremost had any palpable interest in settling Butler's (and, derivatively, Home's) liability as well as its own. Employers and National, in paying more than their pro rata shares of liability, were protecting their respective interests, as until all liabilities had been finally fixed there was a possibility that

they might be liable under their policies for the full amount they paid. Foremost, on the other hand, could never have been liable under its policy for more than $250,000. While Foremost's payments relieved its client of all liability, merely protecting its client's interest is insufficient to prevent Foremost from being considered a volunteer. *See Standard Marine Ins. Co. v. Scottish Metro. Assur. Co.*, 39 F.2d 436 (6th Cir.1930), *aff'd*, 283 U.S. 284, 51 S.Ct. 371, 75 L.Ed. 1037 (1931). Therefore, only $250,000 of Foremost's payment is subject to subrogation.

Foremost and Home each had an "other insurance" clause providing for "contribution by equal shares":

(a) Contribution by Equal Shares. If all of such other valid and collectible insurance provides for contribution by equal shares, the company shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit of liability under any one policy or the full amount of the loss is paid, and with respect to any amount of loss not so paid the remaining insurers then continue to contribute equal shares of the remaining amount of the loss until each such insurer has paid its limit in full or the full amount of the loss is paid.

Therefore, since both policies contain the above clause, payment is properly apportioned by the equal shares method.[15] Thus, we conclude that Foremost is entitled to $125,000 in subrogation from Home.

REVERSED and RENDERED.

---

**14.** Foremost obviously is not entitled to be subrogated to any payments made to settle its independent liabilities not arising under the policy. *See Standard Marine Ins. Co. v. Scottish Metro. Assur. Co.*, 283 U.S. 284, 288, 290, 51 S.Ct. 371, 373, 75 L.Ed. 1037 (1931).

**15.** We note that under *Beech Aircraft Corp. v. Jinkins*, 739 S.W.2d 19, 22 (Tex.1987), a tortfeasor who settles a plaintiff's entire claim

usually will be prohibited from obtaining contribution from joint tortfeasors. We do not apply this rule to the instant case, though, for two reasons: First, Foremost's policy contained a specific subrogation provision, so recovery need not be made under a contribution theory; second, a claim for wrongful refusal to defend sounds in contract rather than tort. *See Whatley*, 758 S.W.2d at 310.