**LIBERTY MUTUAL INSURANCE COMPANY Plaintiff,**

v.

**MID–CONTINENT INSURANCE COMPANY Defendant.**

**No. 3:01–CV–1550–K.**

United States District Court,
N.D. Texas,
Dallas Division.

June 6, 2003.

Richard A. Capshaw, R. Matthew Garner, Capshaw, Goss & Bowers, Dallas, TX, William M. Ravkind, Ravkind & Associates, Dallas, TX, for Plaintiff.

Brian Lynn Blakely, Carrie E. Davis, Brian L. Blakely & Associates, San Antonio, TX, for Defendant.

Cynthia Solls, Law Office of Cynthia Solls, Dallas, TX, Pro se.

## MEMORANDUM OF DECISION AND OPINION

KINKEADE, District Judge.

This case involves a dispute between two insurance companies over the extent each should contribute to a settlement on behalf of an entity that both parties insured. This matter came before the Court for a two-day bench trial beginning February 3, 2003. The Court, having received and considered the evidence presented and having heard the testimony of witnesses and the argument of counsel, hereby renders the following Findings of Fact and Conclusions of Law. As permitted by Fed.R.Civ.P. 52(a), the Court sets out its findings and conclusions in this memorandum opinion and order.

## I. Background

At issue here is the proportionate responsibility of Liberty Mutual Insurance Company and Mid–Continent Insurance Company for a $1.5 million settlement brokered by Liberty Mutual on behalf of Kinsel Industries Inc. ("Kinsel"). The claims against Kinsel stemmed from an automobile accident in a highway construction zone where Kinsel was working for the State of Texas as the general contractor. As part of the construction plan, the highway's eastbound lanes were closed, and eastbound traffic was diverted onto one of the two westbound lanes. The collision occurred on November 9, 1996, when Tony Cooper, who was westbound, crossed the center divider into the eastbound lane and collided head-on with the a car driven by James Boutin. Mr. Boutin, his wife Patricia, and their children, Curtis and Crystal, suffered the following physical injuries:

- Mr. Boutin, who was 39–years–old, suffered a broken right leg, broken right ankle, broken left leg, broken ribs, and a collapsed left lung;

- Mrs. Boutin, who was 34–years–old, suffered a broken ankle, broken right leg, and injuries to both knees;

- Curtis, who was 16–years–old, suffered a broken back, a severely broken ankle, and partially severed foot; and

- Crystal, who was 14–years–old, suffered a lacerated spleen and a partially severed ear lobe.

Joint Pretrial Order, Stipulated Facts, pp. 4–10. In total, the family sustained $313,799 in medical expenses and $24,584 in lost wages. Exhibit 27.

On July 14, 1997, the Boutins sued Cooper, then later added Kinsel, the State of Texas, and Crabtree Barricade Systems, Inc. ("Crabtree"). Crabtree was the subcontractor in charge of providing the safety signs and dividers between the lanes of traffic. The Boutins alleged that their injuries were caused, in part, by the failure to provide adequate warning signs and instructions for drivers passing through the construction zone. Joint Pretrial Order, Stipulated Facts, pp. 4–10.

Liberty Mutual insured Kinsel under three policies: a commercial general liability ("CGL") policy with a $1 million limit, a business auto policy with a $1 million limit, and an "umbrella policy" that provided Kinsel with $10 million in coverage once all other applicable insurance was exhausted. Mid–Continent also provided coverage to Kinsel as an additional insured under a $1 million CGL policy issued to Crabtree. Joint Pretrial Order, Stipulated Facts, pp. 4–10. On April 10, 1998, Mid–Continent sent a letter to Liberty Mutual confirming their agreement to split the defense and indemnification of Kinsel equally. Exhibit 43. Therefore, the parties do not dispute that each owed a duty to pay some portion of Kinsel's defense and indemnification.

At the outset of the Boutin's suit, Liberty Mutual retained Robert Scruggs of Pfeiffer, Vacek, Pfeiffer, Scruggs & Hoffman, L.L.P., to represent Kinsel. In October 1998, Scruggs provided Liberty Mutual with an assessment of the case in which he estimated that Kinsel's potential exposure in the case was minimal. He reasoned that Cooper would certainly be found negligent, and that the State bore the majority of the blame if the jury believed that inadequate warnings contributed to cause the accident because it was charged with designing the construction project. Kinsel, on the other hand, had no authority to install warning signs or dividers. Scruggs also thought that Crabtree had more potential exposure to liability than Kinsel, because Crabtree was charged with providing warning signs and barricades and was in a better position to recommend additional safety precautions if they were needed. Accordingly, Scruggs initially thought that Kinsel could settle the Boutin's claims for $50,000 or less. Exhibit 16.

However, in November 1998, evidence surfaced suggesting that Kinsel had more exposure than previously suspected. Scruggs sent a letter to Liberty Mutual and Mid–Continent informing them that the Boutins filed the affidavits of two fact witnesses, Cyndi Harmon and Paula Bunton, stating that "Do Not Pass" signs were not in place on the day of the accident. Cyndi Harmon also produced a video showing that there were no "Do Not Pass" signs at the area where the accident occurred on November 12, three days after the accident, but that the signs were in place on November 15. Scruggs believed that the testimony of these witnesses could be "quite dangerous" and "require[d] a change in thinking with regard to liability." Exhibit 19, 68.

By December 1998, Scruggs determined that a very different liability picture had developed than what previously existed. Scruggs reminded the insurers that this was a case of "serious damages" and that while liability was not certain, a jury could award damages in the range of $3–5 million if it determined that the defendants were attempting to cover-up blame for the accident. Consequently, Scruggs conclud-

ed that the case had "substantial settlement value even when taking into account the liability uncertainties." Exhibit 68.

Matters continued to worsen for Kinsel according to Scruggs. In January 1999, Scruggs reported that Lee Mathews, who was the project manager for the State on the construction project, testified in a deposition that he told Kinsel's representative, Jeff McCall, to install "Do Not Pass" signs two days before the accident occurred, and expected Kinsel to have the signs installed by the time of the accident. Scruggs also reported that the evidence as developed showed that cars were passing other cars within the construction zone from the day the project opened on November 5. This prompted the State to request the "Do Not Pass" signs. Finally, Scruggs indicated that the Harmon video showed that the only "Do Not Pass" signs in the construction site at the time of the accident were West of the accident sight. Because Cooper was westbound, he would not have passed nor seen these signs before the accident. Exhibit 77, 78.

As trial approached in May 1999, Liberty Mutual, Mid–Continent, and Scruggs exchanged a flurry of letters in an attempt to negotiate a settlement. All three agreed that a verdict in the case would probably be in the rage of $2–3 million. On May 10, Mid–Continent's representative, Ray Corley, estimated in an internal e-mail that a jury would find Kinsel 15% responsible, and he requested authority to settle Mid–Continent's portion of Kinsel's liability for $175,000 (i.e. $2.5 million × 15% × 1/2). Exhibit 89. However, that same day, Mid–Continent informed Liberty Mutual that it would contribute only $50,000 on behalf of Kinsel to a $350,000 group settlement for all defendants. Exhibit 88. Approximately one week later, Mid–Continent agreed to increase its settlement offer on behalf of Kinsel, and con-

tribute $187,500 toward a joint settlement offer; $125,000 on behalf of Crabtree and $67,500 on behalf of Kinsel. Exhibit 92.

On May 19, Scruggs again wrote a letter to Mid–Continent and Liberty Mutual informing the insurers that Mathews had recanted his testimony that the State requested Kinsel install "Do Not Pass" signs before the accident based on a review of the State's logs. However, further developments caused Scruggs to be more concerned that Kinsel was exposed to substantial liability in the case. First, Scruggs was not confident a jury would believe that Mathews was simply mistaken in his earlier testimony. He was also concerned that there was no evidence that Kinsel passed the order on to Crabtree if the jury believed Mathews had in fact ordered Kinsel to place the signs before the accident. Scruggs was worried Kinsel might bear the full responsibility for the accident, if the jury concluded that failing to install the "Do Not Pass" signs contributed to the cause of the accident.

Moreover, Scruggs reported the Boutins had clearly targeted Kinsel as the main defendant, because Kinsel had the most insurance coverage. On May 12, the Boutins filed an amended petition seeking punitive damages against Kinsel alone. In addition, the Boutins non-suited the State, which under Texas law at the time meant the jury would apportion responsibility to the Boutins among Kinsel, Crabtree, and Cooper. The State's responsibility to pay contribution to the other defendants would be assessed in a separate question. These developments were particularly disconcerting to Scruggs, because they reduced the number of defendants that could be found liable to the Boutins, increasing the likelihood a jury might find Kinsel more than 50% responsible. If Kinsel was found more than 50% responsible, it would be

jointly and severally liable for the entire verdict.

Scruggs also expressed concern that the trial court appeared to heavily favor the Boutins. Scruggs informed the insurers the defendants were not able to obtain any favorable rulings, and that the Boutin's local counsel could do no wrong. Scruggs commented that "Plaintiffs' counsel received a winning streak that was nothing short of remarkable." In light of the trial court's rulings, Scruggs was particularly worried the court would exclude the testimony of Kinsel's expert accident reconstruction witness.

Based on these developments, Scruggs "significantly reevaluated Kinsel's exposure in this case." He determined there was a "substantial likelihood" that a jury would determine Kinsel was more than 50% responsible for the accident and that Kinsel would, therefore, be jointly and severally liable. Because the case had significant settlement value with respect to Kinsel, Scruggs cautioned that "the settlement authority which has been made known to date is now unrealistic." Exhibit 23, 97.

On May 21, matters again worsened for Kinsel. As Scruggs feared, the trial court excluded most aspects of Kinsel's accident reconstruction expert. In a phone conference between Scruggs and representatives from both insurers, Scruggs relayed again that the jury's initial assessment of fault would not include the State because the State was no longer a defendant, and that it was possible the Boutins would non-suit Cooper before trial as well. Under that scenario, the jury would apportion liability to the Boutins between Kinsel and Crabtree alone. The proportionate responsibility of the State and Cooper would be assessed in a separate question. Scruggs predicted Kinsel would probably be found 60% at fault on a verdict in the range of $2–3 million. Consequently, Scruggs esti-mated Kinsel's proportionate responsibility to be $1.5 million (i.e. 60% of $2.5 million), with a potential for joint and several liability for the entire verdict. Exhibit 102.

However, neither Scruggs' May 19 letter nor the May 21 phone conference altered Mid–Continent's offer to the settle case outright. On the same day as the phone conference, Corley sent a letter reasserting the May 18 offer of $187,500 by Mid–Continent to a joint settlement for all defendants. Exhibit 25. On May 24, Corley sent an interoffice memo in which he again estimated that Crabtree's potential exposure was 10% of a potential $2–3 million verdict and Kinsel's exposure was only 10–15% of that verdict. Corley, therefore, asked for authority to settle the claims against Kinsel and Crabtree collectively for only $400,000. Exhibit 103.

As the parties prepared for a May 28 mediation, the insurers again exchanged several letters. On May 26, Corley informed Liberty Mutual's representative it would contribute no more than $400,000 on behalf of Kinsel and Crabtree collectively. Exhibit 27–A, 107. Liberty Mutual's counsel, Clayton Devin, responded to Corley's letter, warning that Liberty Mutual intended to settle the claims against Kinsel if a settlement could be accomplished on a reasonable basis, and that it would not be "bound by an arbitrary limitation which Mid–Continent has attempted to place on its contribution to a settlement." Devin also cautioned that Liberty Mutual reserved its rights to seek recovery against Mid–Continent for its portion of the settlement. Exhibit 110.

At the May 28 mediation, Mid–Continent and Liberty Mutual continued to disagree over the value of the claims against Kinsel. By the afternoon, Corley advised Liberty Mutual that Mid–Continent would contribute no more than $150,000 on behalf of Kinsel. Although he could not say why,

Corley believed Cooper would not be non-suited. Corley also believed the evidence would show Kinsel was not ordered to install "Do Not Pass" signs before the accident. Scruggs disagreed, and on two separate occasions requested that Mid–Continent reconsider and contribute additional funds to settle the case. Exhibit 120. Corley refused to offer more than $150,000 on behalf of Kinsel. Despite Corley's recalcitrance, Liberty Mutual decided to settle the claims against Kinsel for $1.5 million, of which Mid–Continent agreed to pay only $150,000. Exhibit 38. Crabtree settled for $300,000 and the State settled for $250,000. Joint Pretrial Order, Stipulated Facts, pp. 4–10.

Even after the settlement was reached, Liberty Mutual pursued its request that Mid–Continent contribute more money on Kinsel's behalf. Mid–Continent repeatedly refused Liberty Mutual's requests, leading to this suit. Because Mid–Continent has only contributed $150,000, Liberty Mutual asserts that Mid–Continent still owes $600,000. In response, Mid–Continent contends Liberty Mutual is barred from subrogation, because it violated the "no action" provision in Mid–Continent's policy prohibiting settlement without Mid–Continent's approval. Mid–Continent also argues Liberty Mutual waived its right to subrogation by failing to reserve its right of reimbursement, and by participating in mediation of the underlying suit. Finally, Mid–Continent asserts that even if it is liable to Liberty Mutual, it can be liable for only $550,000, because it has already contributed $450,000 of its $1 million policy to the settlement of the Boutin's case (i.e. $150,000 on behalf of Kinsel and $300,000 on behalf of Crabtree).

Mid–Continent also counter-claimed for subrogation, arguing it overpaid on the Kinsel settlement by $34,615.38. Mid–Continent argues the "other insurance" clause in the business auto policy requires that the defense and settlement costs for Kinsel's liability be apportioned pro rata. In other words, each insurer should contribute a percentage of the settlement equal to the proportion of its aggregate policy limits to the total available coverage. According to Mid–Continent, it is responsible for 1/13 of Kinsel's liability, or $115,-384,62, because its policy provided $1 million in coverage and it argues the total available insurance was $13 million. Consequently, Mid–Continent asserts it is entitled to recover $34,615.38 from Liberty Mutual. Liberty Mutual counters that neither the business auto policy nor the excess liability policy were triggered by the accident, leaving only the CGL policy of each insurer. Because both policies provide $1 million in coverage, Liberty Mutual argues Mid–Continent is responsible for half of the settlement regardless of how liability is apportioned.

## II. Waiver

Because the issue is potentially dispositive, the Court considers Mid–Continent's waiver argument first. Mid–Continent asserts Liberty Mutual waived any right to subrogation because (1) Liberty Mutual failed to reserve its right to reimbursement or obtain a written non-waiver agreement from either Kinsel or Mid–Continent and (2) Liberty Mutual accepted Mid–Continent's $150,000 contribution to the Boutin settlement. Neither argument has merit.

■ Mid–Continent's first waiver argument was specifically addressed, and rejected, by the Fifth Circuit in *St. Paul Mercury Ins. Co. v. Lexington Ins. Co.*, 78 F.3d 202 (5th Cir.1996). In that case, four insurance companies insured Sanifill, Inc.: Centennial Insurance Co., St. Paul Mercury Insurance Co., Landmark Insurance Co., and Lexington Insurance Co. When Sanifill was sued by one of its employees,

Centennial and St. Paul assumed its defense and reached a settlement to which all four insurers contributed. Litigation later ensued among the insurers in which St. Paul and Centennial were ultimately aligned as plaintiffs seeking subrogation from Lexington and Landmark. Lexington and Landmark argued that Centennial and St. Paul waived any right for subrogation, because neither had timely reserved its right to reimbursement. Landmark and Lexington relied on several Texas cases holding that an insurer must reserve its right to seek reimbursement from its insured for losses not covered under the policy. *Id.* at 207–08.

The Fifth Circuit distinguished the cases cited by Landmark and Lexington, noting that the relationship between an insurer and its insured differs significantly from the relationship between two insurance companies. *Id.* at 207–08. The waiver rule that requires an insurer to reserve its right of reimbursement is intended to protect the insured from potential abuses by the insurance company. The same risks do not exits between sophisticated insurance companies. The court concluded the rule is "simply not intended to be applied to the relationship among insurers." *Id.* at 207–08. Therefore, an insurance company need not reserve its right to reimbursement with respect to the insured or a co-insurer to seek subrogation from a co-insurer. *Id.* at 208.

■ Neither can Mid–Continent assert Kinsel's right to assert waiver by way of equitable subrogation. The doctrine of equitable subrogation allows a party who pays the debt of another to stand in the released creditor's shoes and assert a claim the creditor would have against anyone else liable on the debt. *Id.* For Mid–Continent to rely on equitable subrogation to assert Kinsel's waiver defense, assuming such a defense exists, it must establish that Kinsel has a cause of action against Liberty Mutual to which Mid–Continent can be subrogated. *Id.* at 208–09. For example, Mid–Continent could attempt to establish its right to equitable subrogation by proving that Kinsel had a viable claim against Liberty Mutual for negligent handling of the Boutin litigation.

In *St. Paul Mercury Ins. Co.*, the court noted that Centennial and St. Paul fulfilled their obligations to Sanifill by settling the case within policy limits and there was no evidence either insurer failed to act in good faith. *Id.* at 209. In short, Lexington and Landmark failed to produce any evidence that Sanifill had a cause of action against Centennial or St. Paul arising out of their defense of Sanifill to which Lexington and Landmark could be subrogated. *Id.* Likewise, in this case, Liberty Mutual fulfilled its obligation to Kinsel by defending the case and attaining a settlement within the limits of Kinsel's insurance coverage. As discussed more fully below, Liberty Mutual's estimation of Kinsel's liability was reasonable considering the severity of the injuries and Kinsel's potential responsibility. Moreover, there is no evidence that Liberty Mutual failed to act in good faith. Accordingly, there is no evidence that Kinsel has any viable cause of action against Liberty Mutual such that Mid–Continent would be subrogated to Kinsel's waiver defense.

■ Mid–Continent's second waiver argument also fails. Mid–Continent contends that Liberty Mutual waived its right to subrogation by accepting the $150,000 payment from Mid–Continent on Kinsel's behalf. "Waiver involves the intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *Matador Petroleum Corp. v. St. Paul Surplus Lines Ins. Co.*, 174 F.3d 653, 660 (5th Cir.1999). Here, Liberty Mutual made every effort to retain its right to

pursue additional contribution from Mid–Continent. Shortly after Mid–Continent refused to contribute more than $400,000 to settle the claims against Kinsel and Crabtree, Liberty Mutual sent a letter to Mid–Continent stating it would not be bound by "any arbitrary limitation" established by Mid–Continent. Liberty Mutual also reserved all rights of recovery that Kinsel or Liberty Mutual might have against Mid–Continent related to the resolution of the Boutin litigation. Finally, Liberty Mutual continued to pursue additional contribution from Mid–Continent after the Boutin case settled.

Clearly, Liberty Mutual did not intentionally relinquish its right or act inconsistently with its intent to recoup Mid–Continent's portion of the settlement. Liberty Mutual asserted repeatedly that Mid–Continent owed more toward the settlement than it would voluntarily contribute. To hold that Liberty Mutual waived its right to reimbursement would place Liberty Mutual, and other insurers, in the untenable position that providing coverage as required by its policies, waives its right to seek reimbursement from an equally responsible insurer that refuses to contribute its full share of a settlement. The Court determines, therefore, that Liberty Mutual did not waive its right to pursue reimbursement from Mid–Continent for the loss occasioned by the Boutin litigation.

## III. Subrogation

### A. Applicable Law

■ It is well settled that the proper mechanism for an insurer to seek reimbursement from a co-insurer is a subrogation claim. *Employers Cas. Co. v. Transport Ins. Co.*, 444 S.W.2d 606, 610 (Tex. 1969); *see also American Centennial Ins. Co. v. Canal Ins. Co.*, 843 S.W.2d 480, 482 (Tex.1992) (acknowledging equitable subrogation right recognized in *Employers*

*Cas. Co.*). Texas courts, however, have not fully defined the duty co-insurers owe in exercising their rights under their respective policies. Of the Texas courts that have addressed the issue, the most recent is the San Antonio Court of Appeals in *General Agents Insurance Co. of America v. Home Ins. Co. of Illinois,* 21 S.W.3d 419 (Tex.App.—San Antonio 2000, pet dism'd by agr.).

In that case, General Agents Insurance Co. ("GAINSCO") and Home Insurance Co. provided concurrent coverage for Power Equipment International Inc. Each policy provided $1 million in coverage. After mediation, Home determined Power Equipment had significant exposure to liability and offered its policy limits to settle the case. GAINSCO, however, concluded that Power Equipment's potential liability was substantially lower and offered only $250,000. The plaintiff accepted the $1.25 million and Home sued GAINSCO for subrogation of its pro rata portion of the settlement. *Id.* at 422–23.

The trial court determined GAINSCO was liable to Home for a pro rata share of the settlement if a jury determined that $1.25 million was a reasonable settlement amount. *Id.* at 423. The court, therefore, asked the jury to find what amount of money should have been paid to settle the underlying case, to which the jury answered $1.25 million. Based on the verdict, the trial court entered judgment in favor of Home. *Id.* On appeal, GAINSCO argued, in part, that Home's subrogation claim was barred because it violated the "no-action" clause in GAINSCO's policy, which prohibited settlement of the claim without GAINSCO's written consent. *Id.* GAINSCO also argued the settlement violated its right to control the defense and settlement of the lawsuit. *Id.*

■ The court reversed the trial court's judgment, holding the determinative issue in Home's claim for subrogation was not whether the ultimate settlement amount was reasonable, but whether GAINSCO acted reasonably in exercising its rights under its policy given the totality of the circumstances. *Id.* at 426. The court reasoned that each insurer's rights under its policy, including the right to enforce the "no action" clause and the right to control the defense and settlement of the suit, must be balanced with the other insurer's rights. *Id.* at 424. In other words, each insurer owed the other co-insurer an obligation to act reasonably in enforcing its policy provisions. *Id.; see also Storebrand Ins. Co. v. Employers Ins. of Wausau,* 974 F.Supp. 1005 (S.D.Tex.1997), *aff'd,* 139 F.3d 1052 (5th Cir.1998); *Keystone Shipping Co. v. Home Ins. Co.,* 840 F.2d 181 (3rd Cir.1988).

Here, the parties argue, and the Court agrees, that the approach taken by the court in *General Agents Ins. Co.* is the proper method for resolving the disputes in this case. Mid–Continent and Liberty Mutual, as co-insurers of Kinsel, each owed a duty to act reasonably in exercising their rights under their respective policies. Mid–Continent's right to proceed with the defense of Kinsel if the Boutins refused to settle for $300,000 (of which Mid–Continent would pay $150,000) and its right to enforce the no-action provision of its policy must be balanced against Liberty Mutual's right to settle the claim against Kinsel within policy limits and its co-equal right to control the defense and settlement of the lawsuit. *Id.* at 424.

Consequently, the Court must first determine whether, given the totality of the circumstances, Mid–Continent was reasonable in its determination that the claims against Kinsel should settle for no more than $300,000. If Mid–Continent was rea-

sonable in its position, Liberty Mutual is not entitled to subrogation, even if it was also reasonable. A co-insurer is not obligated to accept another insurer's evaluation as long as its own evaluation is reasonable. *Keystone Shipping Co.,* 840 F.2d at 182–83. If the Court determines that Mid–Continent was unreasonable, the second issue is whether Liberty Mutual was reasonable in settling the case for $1.5 million. Liberty Mutual owed a duty to be reasonable as well, and Mid–Continent cannot be forced to contribute to a settlement that was unreasonable. Therefore, Liberty Mutual is entitled to subrogation, only if it was reasonable and Mid–Continent was unreasonable in their assessments of Kinsel's liability. *Id.* at 183.

**B. Reasonableness of the Parties**

■ First, the parties did not disagree on the total settlement value of the Boutin's case; the parties agreed that the Boutins would probably receive a verdict of approximately $2–3 million. The crux of the dispute is the percentage fault Kinsel might bear if a jury apportioned responsibility. At the outset of the case, Scruggs believed that Kinsel had very little exposure, because Kinsel was not responsible for designing or implementing the safety signs or lane dividers. That responsibility rested with the State and with Crabtree. Scruggs, at the time, also believed Cooper would bear a large percentage of fault. In fact, the parties estimated until early May 1999 that Kinsel's fault would range between 10% and 15% of a $2–3 million verdict. Under the agreed estimations at the early stages of the case, Kinsel's potential liability was between $200,000 (i.e. 10% of $2 million) and $600,000 (i.e. 15% of $3 million).

As the case progressed, however, the facts that Mid–Continent knew would be offered by the Boutins changed dramati-

cally. Mathews testified that the State requested Kinsel to install the "Do Not Pass" signs before the accident, expecting the signs to be installed immediately. The Harmon video and affidavit, however, established that the signs were not installed until at least 3 days after the accident, and there was no evidence that Kinsel ever passed the State's request on to Crabtree. The evidence suggested, therefore, that the responsibility for the signs stopped with Kinsel, which could lead to a finding that Kinsel was more than 50% responsible. That Mathews later recanted his testimony may or may not have been sufficient to convince a jury that Kinsel was not asked to install the signs before the accident, and may have even caused the jury to suspect that the defendants were attempting to cover the truth.

Moreover, the non-suit of the State, and the possible non-suit of Cooper, had a significant impact on Kinsel's potential liability. If both parties were non-suited, the jury would have to apportion among Kinsel and Crabtree 100% of the liability to the Boutins, because Texas law at the time prevented a jury from assigning responsibility to a dismissed, non-settling party. Cooper and the State could only be assigned fault in a separate question to determine whether Kinsel or Crabtree was entitled to contribution for any portion of the damage award. Consequently, with respect to determining whether any party was more than 50% at fault, and therefore jointly and severally liable, Kinsel and Crabtee would be the only defendants against which a jury could assign fault.

Mid–Continent insisted throughout the settlement negotiations that Cooper would not be non-suited, but the circumstances indicated otherwise. Cooper had only $20,000 in insurance coverage and few other assets to pay a judgment. Non-suiting Cooper would not only increase the possibility that Kinsel, with $11 million in coverage, would be found jointly and severally liable, but would also shift the risk of Cooper's insolvency to Kinsel and Crabtree, which would bear Cooper's share of the fault if found jointly and severally liable. Therefore, it was reasonably likely that the Boutins would non-suit Cooper just as they non-suited the State.

Under these circumstances, it was objectively unreasonable for Mid–Continent to refuse to change its estimate that Kinsel's potential exposure was only 10–15% of the total liability. There was a significant potential, and according to Scruggs "a substantial likelihood," that Kinsel would be found jointly and severally liable. Mid–Continent's continued insistence that Kinsel was responsible for only 10–15% of the total liability did not account for the actual exposure faced by Kinsel, and was therefore, unreasonable. This, of course, does not mean Mid–Continent would have been unreasonable in estimating Kinsel's liability at something less than what Liberty Mutual determined was appropriate. It means only that Mid–Continent's recalcitrance to consider any change, despite the changing circumstances, was unreasonable, causing it to unreasonably assess its insured's exposure.

Unlike Mid–Continent, Liberty Mutual remained flexible in the changing environment of the Boutin case. Liberty Mutual recognized that if the jury believed Kinsel was asked to place the "Do Not Pass" signs before the accident, but failed to do so, Kinsel could bear the majority of the liability. Liberty Mutual also appreciated that without the State, and potentially without Cooper, there was a realistic possibility Kinsel would be found more than 50% responsible. Under either scenario, Kinsel faced a significant risk of being jointly and severally liable for a verdict in the range of $2–3 million. Based on

Scruggs' assessment, Liberty Mutual determined Kinsel could be found as much as 60% responsible. Sixty percent of the average potential verdict, $2.5 million, is $1.5 million. By agreeing to settle for that amount, Liberty Mutual resolved the case within policy limits, based on a reasonable estimation of Kinsel's liability, and avoided the real potential of joint and several liability. Accordingly, Liberty Mutual's assessment of Kinsel's liability and the ultimate settlement reached was reasonable.

Because the Court finds that Mid–Continent was unreasonable in exercising its rights under its policy and that Liberty Mutual was reasonable in exercising its rights, Liberty Mutual is entitled to subrogation.

## IV. Proportion of Responsibility

Having determined that Liberty Mutual is entitled to subrogation, the next issue is whether the settlement should be apportioned equally among the parties or on a pro rata basis. This issue depends on the "other insurance" provisions of the applicable policies, which in turn depends on which of the four insurance policies were triggered by the Boutin litigation. Mid–Continent argues that all four policies were triggered, and that the "other insurance" clause in Liberty Mutual's business auto policy requires a pro rata division of responsibility. Liberty Mutual argues that only the CGL policies were triggered, and that it does not matter whether the settlement should be divided pro rata or by equal shares, because either method would require equal contribution from each company. Liberty Mutual's argument is correct.

■ First, the business auto policy issued by Liberty Mutual to Kinsel was not triggered by the Boutin litigation. Mid–Continent argues that the business auto policy provided coverage for bodily injury

and property damage caused by an accident resulting from the ownership, maintenance or use of "a covered auto." Mid–Continent also asserts that the policy's declaration page indicated that covered autos for bodily injury and property damage included those listed in definition "01". Definition "01" is simply "any auto." Consequently, Mid–Continent contends that Kinsel's business auto policy provided coverage for bodily injury or property damage caused by an accident resulting from the ownership, maintenance, or use of any auto.

To support its position that the term "any auto" must be literally construed, Mid–Continent relies on *Foremost County Mut. Ins. Co. v. Home Indemnity Co.*, 897 F.2d 754 (5th Cir.1990). In that case, Foremost and Home insured Eli Butler, who was sued after a motor home driven by Butler collided with another car. After a judgment was entered in the underlying case, Foremost settled the claim for $3.2 million. Foremost then sued Home for subrogation. Home refused to contribute because the motor home Butler was driving was not included on the list of scheduled automobiles covered by Home's policy. *Id.* at 755–56. The Home policy, however, provided Butler with coverage for injury or damage "arising out of the ownership, maintenance or use ... of any automobile." *Id.* at 756. In holding that Home was liable under its policy, the Fifth Circuit ruled that the term "any automobile" should be interpreted literally and that the coverage to the named insured (i.e. Butler) was unqualified. *Id.* at 756–57. If Home had intended to cover only autos listed in the schedule of covered autos, it could have limited its coverage appropriately. *Id.* at 756.

The obvious difference in this case is that neither driver in the accident at issue was a named insured under Kinsel's busi-

ness auto policy. Although a strict interpretation of the language in the policy may suggest that the auto policy was triggered because an auto was involved, it is unreasonable to conclude that Liberty Mutual or Kinsel intended the policy to provide coverage for any auto accident that occurred in the vicinity of Kinsel's operations. The clear intent of the parties to the auto policy was to cover autos owned or operated by Kinsel. In essence, Mid–Continent contends that Liberty Mutual provided auto insurance for every car that passed through the construction zone. That is not a literal reading, but a ludicrous reading of the policy. *Foremost* does not require this Court to construe the policy language so strictly that it causes an absurd interpretation of Kinsel's auto policy. *Westwind Exploration, Inc. v. Homestate Sav. Ass'n,* 696 S.W.2d 378, 382 (Tex.1985) (holding that under Texas' rules for construing contracts, a reasonable interpretation will be preferred over an unreasonable interpretation). Consequently, the auto policy was not triggered.

Mid–Continent asserts an equally creative, and unpersuasive, argument that Liberty Mutual's excess liability policy was triggered by the Boutin's claims. According to Mid–Continent, the CGL policies were also excess policies, because they both contained an excess insurance clause which provided that coverage is excess over any other insurance if the loss arises out of the maintenance or use of an auto. Based on this premise, Mid–Continent contends that the umbrella policy and the two CGL policies are on equal par, and all were triggered because there was no primary insurance.

Even if the CGL policies are excess policies as Mid–Continent contends, Mid–Continent's argument breaks down in its assumption that the two CGL policies and the umbrella policies provide the same level of coverage. The umbrella policy specifically provides that Liberty Mutual's CGL policy, along with all other underlying coverage, must be exhausted before the umbrella policy is triggered. To conclude that all three policies provide the same level of coverage would require the Court to ignore the unambiguous language in the umbrella policy, which the Court cannot do. The only issue, therefore, is whether Mid–Continent's CGL policy provides the level of coverage in Liberty Mutual's CGL policy or the level of coverage in the umbrella policy.

The Fourteenth District Court of Appeals in Houston addressed a nearly identical situation in *Liberty Mutual Ins. Co. v. United States Fire Ins. Co.,* 590 S.W.2d 783 (Tex.Civ.App.-Houston [14th Dist.] 1979, writ ref'd n.r.e.). That case involved a dispute between insurers over the proportionate responsibility for the settlement of a personal injury suit brought by a passenger in an auto accident against the driver and the owner of the car. Liberty Mutual provided the driver with $100,000 in coverage under an auto policy. The car's owner had an auto policy with $100,000 in coverage and an umbrella policy issued by United States Fire Insurance Co. with $1 million in coverage. Ultimately, the underlying litigation settled for $250,000, to which the two auto policy carriers contributed their policy limits and United States Fire paid the remaining $50,000. *Id.* at 784

Liberty Mutual subsequently sued United States Fire arguing its "other insurance" clause provided that its coverage was excess over any other insurance if the loss arose from the driver's use of an automobile that he did not own. Because Liberty Mutual's insured, the driver, was driving a car owned by someone else, Liberty Mutual maintained that its policy provided a concurrent second layer of in-

surance with United States Fire's policy. According to Liberty Mutual, the owner's auto policy should be exhausted first and the remaining $150,000 should be pro rated between Liberty Mutual and United States Fire. *Id.* at 784.

Therefore, as in the present case, the court in *Liberty Mutual* was faced with whether an insurance policy with an excess insurance clause provides the same level of coverage as a similar applicable policy or the level of coverage contemplated in an umbrella policy. In resolving the issue, the court noted that where there is a conflict between the clauses of applicable policies, "courts should look to the overall pattern of insurance to resolve disputes among the carriers." *Id.* at 785. The court then compared Liberty Mutual's auto policy, which generally provided primary coverage and became excess only because of the fortuitous presence of a non-owned auto, with United States Fire's umbrella policy, which provided excess coverage in all events. *Id.* Based on this pattern, the court determined that the apparent intent of the parties was that United States Fire's policy should remain an umbrella policy and that Liberty Mutual's policy should underlie it. *Id.* Consequently, the court held that Liberty Mutual and the owner's auto insurer correctly exhausted their policies before United States Fire became liable for the excess loss of $50,000. *Id; see also Utica Nat'l Ins. Co. v. Fidelity & Cas. Co.*, 812 S.W.2d 656 (Tex.App.-Dallas 1991, writ denied); *Carrabba v. Employers Cas. Co.*, 742 S.W.2d 709 (Tex.App.-Houston [14th Dist.] 1987, no writ).

 In sum, Texas courts recognize a difference between umbrella policies and primary policies containing an excess clause. *Carrabba*, 742 S.W.2d at 715. Umbrella policies are designed to provide coverage beyond the limits of primary coverage, including primary policies with excess clauses. If an umbrella policy provides coverage for loss in excess of underlying policies listed in its schedule and all other collectible insurance, liability will not attach under the umbrella policy until all other collectible insurance has been exhausted. *Id.*

Here, Mid–Continent's CGL policy provided the same level of coverage as Liberty Mutual's CGL policy. Assuming Mid–Continent's CGL policy provided only excess coverage, it became an excess policy only because the loss fortuitously involved an auto not used, maintained, owed, or entrusted by an insured. Liberty Mutual's umbrella policy, on the other hand, provided excess coverage in all circumstances and provided coverage only after the policies listed in its schedule, including Liberty Mutual's CGL policy, and all other collectable insurance was exhausted. Because the combined coverage under the two CGL policies was sufficient to cover the $1.5 million settlement in the Boutin case, Liberty Mutual's umbrella policy was never triggered.

Accordingly, the Court must look only to the two CGL policies to apportion liability for the settlement. Whether liability should be apportioned pro rata or on an equal shares basis is not relevant because both policies provided $1 million in coverage. Under either scenario, both carriers are responsible for one-half of the settlement, or $750,000. However, as Mid–Continent has accurately argued, Liberty Mutual has not presented any basis under which this Court could assign Mid–Continent with liability beyond its policy limits. Mid–Continent has already contributed $300,000 on behalf of Crabtree and $150,000 on behalf of Kinsel. Liberty Mutual is, therefore, entitled to subrogation only in the amount of the remaining $550,000 in coverage.

## V. Deceptive Trade Practices

Finally, Mid–Continent contends that Liberty Mutual engaged in deceptive trade practices by misrepresenting the total nature of coverage available to Kinsel. Specifically, Mid–Continent faults Liberty Mutual for failing to disclose the existence of the auto policy before the Boutin suit was settled. Because this Court determines the auto policy was not applicable to the loss at issue, Liberty Mutual did not misrepresent the nature of available coverage.

## VI. Conclusion

For the foregoing reasons, the Court concludes Liberty Mutual is entitled to subrogation from Mid–Continent in the amount of $550,000. Judgment will issue that Liberty Mutual recover that amount plus any applicable costs and interest.

**SO ORDERED.**