United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 31, 2005**

Charles R. Fulbruge III
Clerk

REVISED APRIL 15, 2005

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 03-10705

---

LIBERTY MUTUAL INSURANCE COMPANY,

    Plaintiff-Counter-Defendant, Appellee-Cross-Appellant,

    versus

MID-CONTINENT INSURANCE COMPANY,

    Defendant-Counter-Claimant, Appellant-Cross-Appellee.

---

Appeal from the United States District Court
for the Northern District of Texas

---

Before GARWOOD, JOLLY and BARKSDALE, Circuit Judges.

PER CURIAM:

This Texas law diversity case involves important and determinative questions of Texas law as to which there is no controlling Texas Supreme Court precedent. Accordingly, we certify those unresolved questions to the Supreme Court of Texas.

CERTIFICATION FROM THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT TO THE SUPREME COURT OF TEXAS,
PURSUANT TO THE TEXAS CONSTITUTION ART. 5, § 3-C AND
RULE 58 OF THE TEXAS RULES OF APPELLATE PROCEDURE

TO THE SUPREME COURT OF TEXAS AND THE HONORABLE JUSTICES THEREOF:

## I.  STYLE OF THE CASE: PARTIES AND COUNSEL

The style of the case in which certification is made is *Liberty Mutual Insurance Company v. Mid-Continent Insurance Company*, Case No. 03-10705, in the United States Court of Appeals for the Fifth Circuit, on appeal from the United States District Court for the Northern District of Texas, Dallas Division. *Liberty Mutual Ins. Co. v. Mid-Continent Ins. Co.*, 266 F. Supp. 2d 533 (N.D. Tex. 2003).  Federal jurisdiction is based on diversity of citizenship.

The names of all the parties to the case, each of whom is represented by counsel, and the respective names, addresses and telephone numbers of their counsel, are as follows: Liberty Mutual Insurance Company, plaintiff and counter-defendant in the district court, appellee and cross-appellant in this court, represented by Richard A. Capshaw and Mikel J. Bowers of Capshaw, Goss & Bowers, L.L.P., 3031 Allen Street, Suite 200, Dallas, Texas 75204, Tel. 214/761-6610; and Mid-Continent Insurance Company, defendant and counter-claimant in the district court, appellant and cross-appellee in this court, represented by Brian L. Blakeley and Carrie Davis Holloway of Blakeley & Reynolds, P.C., 1250 N.E. Loop 410, Suite 420, San Antonio, Texas 78209, Tel. 210/805-9799.

## II.  STATEMENT OF THE CASE

2

In this suit between two liability insurers Liberty Mutual Insurance Company (Liberty Mutual) seeks to recover from Mid-Continent Insurance Company (Mid-Continent) a portion of the sums Liberty Mutual paid to settle a third party claim against Kinsel Industries (Kinsel), a covered insured under each of their respective $1 million comprehensive general liability (CGL) policies. Each insurer assumed defense of Kinsel, and the case ultimately settled for $1.5 million, but Mid-Continent would pay only $150,000, so Liberty Mutual (which also had a $10 million excess policy covering Kinsel) paid the remaining $1,350,000 and then brought this suit against Mid-Continent for $600,000, which it contended Mid-Continent was obligated for as its remaining proportionate part of the $1.5 million settlement. Following a bench trial, the district court awarded Liberty Mutual $550,000. Mid-Continent now appeals that judgment.[1]

Kinsel, the general contractor for the State of Texas on a highway construction project, was the named insured under Liberty Mutual's $1 million CGL policy. Mid-Continent insured Crabtree Barricades (Crabtree), Kinsel's subcontractor responsible for signs and dividers on the project. The Mid-Continent $1 million CGL policy issued to Crabtree also identified Kinsel as an additional insured for liability arising from Crabtree's work under the contract. It is undisputed that these two CGL policies were in

---

[1] Liberty Mutual cross-appeals only the district court's failure to award it prejudgment interest.

3

force and effect and provided Kinsel defense and indemnity coverage respecting the underlying suit against it, of which the insurers were properly notified.  Liberty Mutual and Mid-Continent have consistently treated their respective CGL policies as being primary and on the same level with respect to each other and governed by identical "other insurance" clauses in each policy providing for equal or pro rata sharing up to policy limits.[2]  Each CGL policy

---

[2]  "**4.  Other Insurance.**

If other valid and collective insurance is available to the insured for a loss we cover under Coverages A ["Bodily Injury and Property Damage Liability"] or B of this Coverage Part, our obligations are limited as follows:

a.  Primary Insurance

.  .  . If this insurance is primary our obligations are not affected unless any of the other insurance is also primary.  Then, we will share with all that other insurance by the method described in c. below.

.  .  .

c.  Method of Sharing

If all of the other insurance permits contribution by equal shares, we will follow this method also.  Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits.  Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers."

Liberty Mutual also insured Kinsel under an Umbrella Excess Liability Policy with $10 million policy limits.  In the trial court, Mid-Continent contended that this Umbrella Excess policy should be considered in determining the share of the settlement to be borne by it and Liberty Mutual respectively.

4

also contained "voluntary payment" clauses providing:

> "No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent."[3]

Each CGL policy likewise contained subrogation clauses providing, *inter alia*, "[i]f the insured has rights to recover all or part of any payment we have made under this Coverage Part [bodily injury or property damage liability], those rights are transferred to us."

In November 1996, an automobile accident occurred in the construction zone covered by Kinsel's contract with the State. Due to the construction, the two eastbound lanes of the normally four-lane highway were closed, so that eastbound and westbound traffic were each routed into one of the two (normally) westbound lanes.

---

The trial court rejected that contention, ruling that the Umbrella policy was excess over both Liberty Mutual's and Mid-Continent's CGL policies. 266 F. Supp. 2d 533 at 545-46. Mid-Continent has not appealed that ruling.

Mid-Continent does contend on appeal that Liberty Mutual's $1 million auto policy naming Kinsel insured should have been taken into account in determining what portion of the $1.5 million settlement Mid-Continent was to be charged with, with the result that the ultimate judgment against Mid-Continent should not in any event have exceeded $350,000. Liberty Mutual contends that the district court correctly ruled that this policy did not cover the claim against Kinsel (and that in any event the auto policy provided only excess coverage). The issue thus presented will not be reached unless it is determined that Mid-Continent is obligated to pay Liberty Mutual some portion of the $1.35 million Liberty Mutual paid to effectuate the $1.5 million settlement.

[3] The Mid-Continent and Liberty Mutual CGL policies likewise each contained provisions that any "insured must . . . Cooperate with us in the investigation, settlement or defense of the claim or 'suit'" and that

> "A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Part ['Bodily Injury and Property Damage Liability']or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative."

5

A westbound driver (Cooper) crossed into the lane assigned to eastbound traffic and collided head-on with an eastbound car, driven by James Boutin and carrying his wife and their two children.  The Boutin family members suffered substantial injuries, and they all sued Cooper (the westbound driver), the State, Kinsel, and Crabtree in the district court of Liberty County, Texas, in July 1997.

In April 1998, Mid-Continent agreed to share with Liberty Mutual the costs of defending and indemnifying Kinsel.[4]  Although Liberty Mutual and Mid-Continent agreed that a total verdict for all the Boutins of about $2–3 million was likely, they ultimately differed significantly in their assessments of the settlement value of the case against Kinsel specifically.  Both had initially viewed Kinsel's likely percentage of fault at between 10% and 15%; Mid-Continent remained of that view, but Liberty Mutual, due to developments in the case, later increased its assessment to 60%. At a second mediation with the plaintiffs in May 1999, Liberty Mutual agreed to settle for $1.5 million on behalf of Kinsel and demanded that Mid-Continent contribute half of that amount.  Mid-Continent, calculating the settlement value of the case against Kinsel at $300,000, agreed to pay only $150,000 toward that settlement and so Liberty Mutual funded the remaining $1,350,000

---

[4]  Costs of defense are not in issue in this suit between Liberty Mutual and Mid-Continent.

thereof.[5]  At the same time, Mid-Continent settled the Boutins'
claims against Crabtree for $300,000.[6]

Liberty Mutual filed this action against Mid-Continent in
Texas state court, and Mid-Continent removed the case to federal
court on the basis of diversity.  After a bench trial in February
2003, the district court concluded that Liberty Mutual was entitled
to recovery from Mid-Continent in the amount of $550,000.  That
amount was determined on the basis that under the "Other Insurance"
and "Method of Sharing" provisions of the Mid-Continent and Liberty
Mutual $1 million CGL policies (see note 2 above) Mid-Continent was
obligated to contribute one half of the $1.5 million Kinsel
settlement, or $750,000, and, having contributed $150,000, now owed
$600,000 more; but, Mid-Continent's liability was capped at
$550,000 because its policy limits were $1 million and it had
already paid $450,000 thereof ($150,000 for the Kinsel settlement
and $300,000 to settle the claims against Crabtree), leaving only
$550,000.  *Liberty Mutual*, 266 F. Supp. 2d at 546.

The district court, following *General Agents Insurance Company
of America, Inc. v. Home Insurance Company of Illinois*, 21 S.W.3d
419 (Tex. App.–San Antonio 2000, pet. dism'd by agr.) ("*General
Agents*"), held that each insurer "owed a duty to act reasonably" in

---

[5]  Although Liberty Mutual's CGL policy limits were $1 million, the excess
$350,000 paid by Liberty Mutual is apparently attributable to its $10 million
Umbrella Excess Liability Policy in favor of Kinsel (see note 2, supra).

[6]  No party has questioned the reasonableness of the Crabtree settlement.

7

exercising rights under its CGL policy. *See id*. at 542. The court

noted that Mid-Continent determined "that the claims against Kinsel

should settle for no more than $300,000." Then, after reviewing

the developments in the underlying litigation, the court found in

relevant part as follows:

> ". . . it was objectively unreasonable for Mid-Continent
> to refuse to change its estimate that Kinsel's potential
> exposure was only 10-15% of the total liability. . . .
> Mid-Continent's continued insistence that Kinsel was
> responsible for only 10-15% of the total liability did
> not account for the actual exposure faced by Kinsel, and
> was therefore, unreasonable. . . . Mid-Continent's
> recalcitrance to consider any change, despite the
> changing circumstances, was unreasonable, causing it to
> unreasonably assess its insured's exposure.
>     Unlike Mid-Continent, Liberty Mutual remained
> flexible in the changing environment of the Boutin case.
> . . . Kinsel faced a significant risk of being jointly
> and severally liable for a verdict in the range of $2-3
> million. . . . Liberty Mutual determined Kinsel could be
> found as much as 60% responsible. Sixty percent of the
> average potential verdict, $2.5 million, is $1.5 million.
> By agreeing to settle for that amount, Liberty Mutual
> resolved the case within policy limits, based on a
> reasonable estimation of Kinsel's liability, and avoided
> the real potential of joint and several liability.
> Accordingly, Liberty Mutual's assessment of Kinsel's
> liability and the ultimate settlement reached was
> reasonable.
>     Because the Court finds that Mid-Continent was
> unreasonable in exercising its rights under its policy
> and that Liberty Mutual was reasonable in exercising its
> rights, Liberty Mutual is entitled to subrogation." *Id*.
> at 543-44.

Mid-Continent appeals. In its appeal, Mid-Continent does not

challenge the district court's fact findings as being clearly

erroneous or not adequately supported by the evidence, and we

accept the district court's findings of fact.

8

III.   LEGAL ISSUES

Mid-Continent's principal contention on appeal is that, having timely assumed (together with Liberty Mutual) defense of the suit against Kinsel and acknowledged policy coverage, it was entitled, under the terms of its policy, including the voluntary payment provision, *see Charter Roofing Co., Inc. v. Tri-State Ins. Co.*, 841 S.W.2d 903, 907 (Tex. App.–Houston [14th Dist.] 1992, writ denied), to determine how much it would pay or offer to pay in settlement, and owed no duty in that respect to Liberty Mutual or to Kinsel, except only for the duty it owed Kinsel, in the event of an adverse judgment, to indemnify him under its policy up to the limits thereof and, if the judgment exceeded the policy limits, under *Stowers*, for the entire judgement if its refusal of the plaintiff's offer to settle within policy limits were unreasonable.[7]   Mid-Continent recognizes that its reasoning in this respect is contrary to *General Agents*, but contends that *General Agents*, which was not reviewed by the Texas Supreme Court, is contrary to established

---

[7] *See Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544 (Tex. Comm'n App. 1929, holding approved).   Under *Stowers*, if an insurer rejects a demand to settle within policy limits that would fully release the insured and that an ordinarily prudent insurer would accept, the insurer is liable for a subsequent judgment even if it exceeds the policy limits.  *Stowers*, 15 S.W.2d at 545, 547-48; *Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 848-49 (Tex. 1994).

The district court's judgment seems *not* to have been based on *Stowers* itself or as applied in *American Centennial Ins. Co. v. Canal Ins. Co.*, 843 S.W.2d 480 (Tex. 1992), in that it limits Liberty Mutual's recovery to the $550,000 remaining on Mid-Continent's policy limits, though if not so limited Liberty Mutual's recovery would have been $600,000.  *See Liberty Mutual*, 266 F. Supp. 2d at 546.   But, *Stowers* and *American Centennial* contemplate insurer liability beyond policy limits.   However, Liberty Mutual makes no complaint in this respect and does not challenge this aspect of the judgment in its cross-appeal.

Texas law.[8] Mid-Continent contends that it breached no duty under its policy, that it breached no *Stowers* duty to its insured Kinsel to which Liberty Mutual could be subrogated, and that, apart from any such subrogation to Kinsel's rights, Liberty Mutual was owed no duty by Mid-Continent. In the latter connection, Mid-Continent notes that in *American Centennial Ins. Co. v. Canal Ins. Co.*, 843 S.W.2d 480 (Tex. 1992), the Texas Supreme Court held that the only duty which a primary liability insurer owed to an excess liability carrier was by way of the excess carrier's subrogation to the *Stowers* rights of the common insured, and that there was no independent duty owed by the primary to the excess carrier. *Id*. at 485-86 (opinion of Hecht, J., joined by Phillips, C.J., and Gonzalez, Cook and Cornyn, J.J.).

Liberty Mutual essentially rests on *General Agents*. There, GAINSCO and Home were concurrent primary liability insurers, each for $1 million, of Power Equipment, a defendant in a personal injury suit. GAINSCO and Home each acknowledged coverage and provided defense. GAINSCO was willing to provide $250,000 to settle, but no more. Home's offer to settle for $1,250,000 was

---

[8] The district court's opinion states that "the parties argue . . . that the approach taken by the court in *General Agents Ins. Co.* is the proper method for resolving the disputes in this case." *Liberty Mutual*, 266 F. Supp. 2d at 542. Although Liberty Mutual did rely in the district court (as it does on appeal) on *General Agents*, Mid-Continent correctly points out that the district court's statement is in error insofar as it implies that Mid-Continent agreed that *General Agents* controlled, and that in fact Mid-Continent argued below that *General Agents* was not a correct statement of Texas law, a position that Mid-Continent also re-urged in its timely motion for reconsideration below.

10

accepted by the plaintiff and funded $1 million by Home and $250,000 by GAINSCO. Home sued GAINSCO for $375,000 (one half the $1,250,000 settlement less the $250,000 paid by GAINSCO), and recovered judgment based on the jury finding that $1,250,000 was "the fair and reasonable amount that should have been paid to settle the claim against" Power Equipment. GAINSCO objected to the failure to submit an issue as whether it acted "reasonably and in good faith in the defense . . . and settlement" of the suit. *General Agents*, 21 S.W.3d at 424-25. On GAINSCO's appeal, the San Antonio Court of Appeals reversed and remanded for a new trial, holding that "[t]he trial court should have submitted a question to the jury that inquired about the reasonableness of GAINSCO's position and actions in exercising its rights under its policy given the totality of the circumstances." *Id*. at 426. The opinion, however, plainly indicates that GAINSCO would be liable to Home had such an issue been submitted and answered adversely to GAINSCO.

The basis of this latter holding is, however, somewhat unclear. The *General Agents* opinion expressly recognizes that "Home had the burden of proving its right to payment [from GAINSCO] through contractual or conventional subrogation to the right of Power Equipment." *Id*. at 425. It cites in support *Employers Casualty Co. v. Transport Ins. Co.*, 444 S.W.2d 606, 610 (Tex. 1969), and *Liberty Mutual Ins. Co. v. General Ins. Co.*, 517 S.W.2d

11

791, 798 (Tex. Civ. App.–Tyler, 1974, writ ref'd n.r.e.), recognizing, however, that in both of those cases the non-contributing co-insurer had wrongfully denied coverage and refused to defend, *Employers Casualty Co.,* 444 S.W.2d at 607; *Liberty Mutual Ins. Co.,* 517 S.W.2d at 798, thus forfeiting its right to rely on the "no action" and/or "voluntary payment" clauses of its policy as recognized in *Gulf Insurance Co. v. Parker Products*, 498 S.W.2d 676, 679 (Tex. 1973). The *General Agents* court acknowledges that was not the situation in the case before it, as "GAINSCO did not erroneously claim that it had no responsibility. It was ready and willing to proceed in its defense of Power Equipment at trial." *General Agents,* 21 S.W.2d at 424. Nevertheless, *General Agents* concluded that GAINSCO could be liable to Home because:

> "GAINSCO's willingness to proceed with the defense of the lawsuit and its right to enforce the no-action clause in its policy must be balanced against Home's desire to settle for policy limits and its co-equal right to control the defense and settlement of the lawsuit." *Id*.

This suggests, however, that liability would be based on a duty between co-insurers, rather than subrogation by one co-insurer to the rights of the insured against the other co-insurer.

The only authority on which *General Agents* appears to ultimately be based consists of two cases which it describes as the ones on which "*GAINSCO relies . . .* to support its view of the proper question to be submitted to a jury in this type of case,"

12

*id.* at 425 (emphasis added),[9] namely *Storebrand Ins. Co. U.K. , Ltd. v. Employers Ins. Co. of Wausau*, 974 F. Supp. 1005 (S.D. Tx. 1997), *aff'd*, 139 F.3d 1052 (5th Cir. 1998), and *Keystone Shipping Co. v. Home Ins. Co.*, 840 F.3d 181 (3d Cir. 1988).

In *Storebrand* the defendant, Wausau, a servicing agent for the Texas Workers Compensation Facility and issuer on its behalf of a $500,000 Workers Compensation and Employers Liability policy covering an employee leasing company and its clients, undertook the defense of a suit against the leasing company and TDI, one of the leasing company's clients, brought by an employee of the leasing company injured while working for TDI. The plaintiff demanded $500,000 to settle, Wausau would pay no more than $300,000, and, at TDI's demand, TDI's comprehensive general insurer, Storebrand, paid the remaining $200,000 to effectuate the settlement. Storebrand then sued Wausau for that $200,000. The district court granted summary judgment for Wausau, concluding that as a matter of law it had a reasonable basis for not offering more than $300,000 in settlement, *Storebrand*, 974 F. Supp. at 1009, and this court affirmed. *Storebrand*, 139 F.3d 1052. It is unclear whether the district court regarded the employee's claim as a first party claim (under *Aranda Ins. Co. of North America*, 748 S.W.2d 210, 212 (Tex. 1988)) or a third party claim, or whether it regarded Storebrand as

[9] This suggests that the defendant-appellant GAINSCO was not contending that it could not have liability to Home, the other co-insurer in that case, had GAINSCO been found to have acted unreasonably.

13

an excess, rather than a co-primary, insurer, or as asserting TDI's rights against Wausau by subrogation or as claiming rights directly owed Storebrand by Wausau.[10]  In sum, *Storebrand* simply casts no meaningful light on the present issue.

*Keystone* – the other decision relied on by *General Agents* – somewhat more directly addresses the issue.  There, Home Insurance was one of several third level excess liability carriers providing coverage to the defendant in the underlying tort suit for property damage.  The plaintiff in the underlying suit offered to settle for $30 million, but Home refused to contribute more than its pro-rata share of $24.8 million, which it concluded was the fair value of the case.  The other third level excess carriers made up the

---

[10]  The district court in *Storebrand* held that Wausau, as it was acting only as an agent for the insurer, the Texas Workers Compensation Facility, could not be liable for breach of good faith and fair dealing, but could be liable for its own violations of the DTPA or the Texas Insurance Code.  *Id.*, 974 F. Supp. at 1009.  The court noted that the employee's suit alleged claims "under the Longshore and Harbor Workers' Compensation Act (LHWCA) and claims for negligence" but never "alleged claims against TDI under section 905(b) of the LHWCA."  *Id.* at 1007.  We agreed.  *Id.*, 139 F.3d at 1054.  The district court did not address *Stowers*.  In affirming the district court, we stated:

> "Storebrand contends that the district court erred in finding that Wausau acted in good faith and thus was immune from liability under [Insurance Code] Article 21.21 and the DTPA.  Storebrand's claims complain of unfair claims settlement practices.  As such, they do not sound in fraud, nor do they claim fraud or misrepresentation.  Instead, they are essentially statutory bad faith claims.  We have already stated that we believe Wausau's actions were reasonable.  Similarly, we do not see any evidence of bad faith. . . .
>
> . . .
>
> *Storebrand does not prevail under the terms of the Stowers doctrine.*  First, Wausau's actions were not unreasonable, and they were not imprudent.  Also, *no judgment was made against TDI, because the matter was settled in mediation.*  Further, the insurer in this case is the Facility, and Wausau should not be made liable as an insurer in this context."  *Id.*, 139 F.3d at 1056 (emphasis added).

14

difference and the case was settled for $30 million. The other contributing carriers sued Home in the Pennsylvania Federal District Court for $965,011.22, being Home's pro rata share of the difference between $24.8 million (as to which Home had paid its share) and the $30 million settlement amount. Although finding that the $30 million settlement was not unreasonable (and that Home's pro rata share of the full $30 million settlement was not more than its policy limits), the district court held for Home based on its finding that Home's $24.8 million evaluation was reasonable and in good faith. On appeal, the Third Circuit affirmed, holding that the district court's fact findings were not clearly erroneous. *Keystone*, 840 F.2d at 184, 186. The court noted that "the governing" law was that "of Pennsylvania," and that there was an "absence of controlling Pennsylvania authority." *Id*. at 186. The *Keystone* court (one judge concurred in the result with minimal elaboration) reasoned that Pennsylvania likely "would not have a recalcitrant insurer whose evaluation falls within the range of all reasonable settlements wholly free to escape payment of its portion of a reasonable settlement by its co-insurer," but that when "the co-insurer who objects to the size of the proposed settlement nevertheless contributes to a settlement which is not unreasonably low" its "obligation is measured by good faith." *Id*. at 184. The court notes its agreement with the assumption of the parties that a co-insurer in Home's position owes some duty to the

15

other co-insurer but expressly declines to identify the source of that duty. *Id*. at 184-85 & n.9.[11] The court concludes that, even though the co-insurers' settlement at $30 million was not unreasonable, neither was Home's $24.8 million evaluation, *id*. at 185, 186, and Home accordingly should not be liable, observing "[w]e find it hard to conclude that Pennsylvania would impose on a co-insurer a greater obligation to his fellows than it does upon an insurer to its insured." *Id*. at 186.[12]

As neither the *General Agents* opinion itself nor the authorities it cites reflect the source of the duty imposed on a co-insurer in Mid-Continent's position, we accordingly examine the traditional *Stowers* duty imposed on liability insurers.

The decisions of the Texas courts are unclear with respect to whether Kinsel, the common insured here, would have any *Stowers* cause of action, to which co-insurer Liberty Mutual could be subrogated, against Mid-Continent for its unreasonable refusal to

---

[11] The court states:

". . . the parties assume the existence of a duty on the part of Home, as co-insurer, to pay a share of this settlement pro-rata to the share of indemnity it underwrote in the third excess level contract. They do not refer us to the source of that duty. . . . we believe some duty exists. . . . Without precisely pigeonholing the nature of its origin, we will therefore accept their invitation and assume a duty's existence without determining whether it arises out of obligation implied in contract, duties of contribution or equitable subrogation imposed by the law of restitution, or by a fictional duty constructed from the loan receipts [received from the insured by the co-insurers suing Home]." *Id.*, n.9.

[12] While the court mentions Home's "good faith," it also suggests that its "holding . . . may support the view that the distinction between good faith and reasonableness is largely illusory." *Id.*, n.11.

16

pay more than $150,000 (of its remaining $700,000 policy limits) to consummate the $1,500,000 settlement. This lack of clarity arises in several respects.

First, a *Stowers* claim involves, or at least typically involves, an excess judgment after an actual trial. *See Street v. Court of Appeals*, 756 S.W.2d 299, 301-02 (Tex. 1988). And, absent a judgment following trial, it would be difficult to know whether the failure to accept a settlement offer within policy limits constituted negligence or whether, or to what extent, the insured was in fact damaged thereby. *See Texas Farmers Ins. Co. v. Soriano*, 881 S.W.2d 312, 316 n.4 (Tex. 1994) ("[a]s in any case predicated on negligence, the insured must offer evidence that the insurer's failure to settle proximately caused damages to the insured . . . Soriano had the burden of proving that he would have suffered a lesser amount of damages had Farmers behaved differently . . . .").[13] Moreover, allowing a *Stowers* recovery in such circumstances appears to deny the insurer the benefit of the policy's clauses (see note 3 *supra* and accompanying text) precluding recovery of "voluntary payment" or other than under a settlement approved by the insurer or a judgment "against an insured obtained after an actual trial." *See Street*, 750 S.W.2d at

---

[13] Moreover, here there are no express findings that a judgment against Kinsel after an actual trial would likely have exceeded either the amount of the total settlement ($1,500,000) (or even the amount of Mid-Continent's remaining policy limits of $700,000).

302.[14]  While, as above noted, an insurer has been held to have waived the benefit of such policy provisions by refusing to defend,[15] we are aware of no Texas case holding that an insurer who assumes the duty to defend and admits coverage (as Mid-Continent did here) waives the benefit of such provisions merely by negligently refusing to accept a settlement offer within policy limits.

There are, however, two Texas Supreme Court decisions which suggest that a *Stowers* claim does not always require judgment after an actual trial.  In *Rocor v. Nation Union Fire Ins. Co.*, 77 S.W.2d 253 (Tex. 2002), the insured, Rocor, which was covered by liability policies providing $1 million self-insured retention and placing the duty to defend on Rocor, sought recovery from its liability carriers for the increased attorney fees Rocor incurred in defense of a third party tort suit (which the insurers ultimately settled within policy limits) due to the insurers' negligent delay in settlement thereof.  The Supreme Court's opinion indicates that, under sections 4(10)(ii) and 16(a) of Tex. Ins. Code art. 21.21,

_____

[14]  *But see State Farm Lloyds Ins. Co. v. Maldonado*, 963 S.W.2d 38, 40-41 (Tex. 1998) (rejecting third party plaintiff-judgment creditor's claim against liability insurer of judgment debtor on "actual trial" policy provision; rejecting insured's *Stowers* claim on lack of demand within policy limits without addressing "actual trial" policy provision).

[15]  *See Liberty Mutual Ins. Co.*, 517 S.W.2d at 798; *Gulf Ins. Co.*, 498 S.W.2d at 679.  *See also Employers Casualty Co.*, 444 S.W.2d at 607.

and likely also under *Stowers*,[16] Rocor, the insured, could have recovered from its liability insurers the attorneys' fees incurred by Rocor in the third party suit following a negligent failure by the insurers to accept a clear offer by the third party to settle the underlying suit within policy limits. Nevertheless, the court denied recovery because there was no evidence of any such offer prior to the actual settlement, as required by *Stowers*. However, judgment following actual trial in the underlying suit was not necessary to demonstrate that Rocor incurred the claimed attorneys' fees sued for, or the amount thereof, prior to the settlement of the underlying suit and because it did not sooner settle. Thus, *Rocor* does not appear to be controlling as to the need for judgment following trial in the underlying third party suit where the *Stowers* claim is for liability to the third party in the underlying suit or for payments made to discharge that liability.

More closely related to the latter scenario is *American Centennial Ins. Co. v. Canal Ins.*, 843 S.W.2d 480 (Tex. 1992), in which the court held, for the first time, that "if an excess insurance carrier is required to pay a portion of a judgment rendered against its insured in favor of a third party, it is equitably subrogated to its insured's rights against a primary

_____

[16] The *Rocor* court construed the cited sections of article 21.21 as imposing an actionable settlement duty which in the context of a third party claim was identical to, or at least no more extensive than, that imposed by *Stowers*. The *Rocor* court did observe, however, that "the case does not fit neatly within the *Stowers* paradigm because the insurer ultimately settled within policy limits." 77 S.W.2d at 261.

insurance carrier under" *Stowers* and *Ranger County Mut. Ins. Co. v. Guin*, 723 S.W.2d 656 (Tex. 1987), "for negligently investigating, preparing to defend, trying or settling the third party action." *American Centennial,* 843 S.W.2d at 485 (concurring opinion of Hecht, J., joined by Phillips, C.J., and Gonzalez, Cook and Cornyn, J.J.).[17] The court only very briefly outlines the facts, observing that the primary carrier, which provided $100,000 coverage, "investigated and defended the suit, hiring an outside law firm," and that "[b]ecause of alleged mishandling by trial counsel of the litigation, the [excess] insurers [who had coverage from $100,000 up to $4 million] were forced to settle for $3.7 million." *Id*. at 481. The trial court had granted summary judgment "determining that the primary insurer . . . owed no duty to the excess carriers," the court of appeals reversed and remanded for trial the claims against the primary insurer, and the Supreme Court affirmed that action of the court of appeals. The extent to which *American Centennial* dispenses with any requirement for a judgment in excess of policy limits following an actual trial is unclear as applied to a *Stowers* action based on negligent refusal of an offer to settle

---

[17] The court also held there was no direct or independent duty owed by the primary carrier to the excess carrier, and that the excess carrier had no claim against the primary carrier for breach of a duty of good faith and fair dealing or under the Texas Insurance Code or the DTPA. *Id*. at 485-86.

The court likewise held that "an excess carrier in the circumstances described above is equitably subrogated to its insured's rights against his attorney for negligent handling of the defense of the third party action," but that "the attorney should not be exposed to any greater liability to the excess carrier than to his client, the insured." *Id*. at 486.

20

within policy limits. To begin with, nothing in the opinion of the Supreme Court, or of the court of appeals (810 S.W.2d 246, Tex. App.–Houston [1st] 1991), in any way addresses that question (or mentions any "actual trial" or "voluntary payment" policy provision) or any contention in respect to it.[18] Moreover, it is apparent that *American Centennial* did not involve refusal of a settlement offer within policy limits. The Supreme Court's opinion merely mentions "alleged mishandling by trial counsel of the litigation," and the presence of a fact issue "as to whether the claim was properly handled," all without any further specification. 843 S.W.2d at 481-82. The court of appeals opinion details the course of the litigation, noting that the defense attorneys had, before depositions were taken, formally admitted facts substantially establishing the insured's liability and had been unable to withdraw those admissions. 810 S.W.2d at 249. There is no mention of any offer to settle within the primary carrier's limits or of any evidence that such a settlement was ever possible, and the court of appeals states "even if Canal had no opportunity to settle the . . . lawsuit within its policy limits of $100,000, it may have breached the *Stowers* duty" because under *Ranger County*

---

[18] The court of appeals observed that the $3.7 million settlement "agreement was formalized, and a judgment was signed on February 3, 1986," *id*., 810 S.W.2d at 250, but it is obvious there was no "actual trial." The court of appeals also held that limitations on the *Stowers* claim against the primary carrier commenced to run 30 days after the judgment (no appeal having been taken) so the excess carriers' suit was timely. *Id*. at 254-55. The Supreme Court affirmed this limitations holding (and likewise held that limitations on the claim against the attorneys handling the case on retention by the primary carrier were tolled until the judgment became final). 843 S.W.2d at 483-84.

21

the "insurer's duty is not limited to accepting reasonable settlement offers within its policy limits." 810 S.W.2d at 254.[19] The Supreme Court in *American Centennial* likewise cites *Ranger County* for the proposition that the *Stowers* duty "extends to claim investigation, trial defense and settlement negotiations." 843 S.W.2d at 482. In sum, it seems clear that *American Centennial* did not involve negligence with respect to a settlement offer, but rather some sort of negligence in respect to handling the pretrial aspects of the defense, while here there is no claim, evidence or finding of anything comparable on the part of Mid-Continent. Finally, although the Supreme Court's expressed holding in *American Centennial* – that an excess insurer is equitably subrogated to the insured's *Stowers* rights against the primary insurer – has never been questioned, later Texas Supreme Court opinions cast doubt on its largely unarticulated conclusion that a *Stowers* violation may be shown absent negligent failure to accept a proper offer to settle within the primary's policy limits (and absent any excess judgment following actual trial). *See American Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 849 (Tex. 1994); *Maryland Ins. Co. v. Head Indus. Coatings & Servs., Inc.*, 938 S.W.2d 27, 28-29 (Tex.

---

[19] Also, the dissenting opinion in the court of appeals states (without contradiction by the majority or by the Supreme Court) that "[t]he set of facts before us is actionable, if it is at all, only by the expansion of the *Stowers* doctrine by the supreme court's holding in *Ranger County* . . . ." 810 S.W.2d at 258.

1996); *State Farm Mut. Auto Ins. Co. v. Traver*, 980 S.W.2d 625, 628

(Tex. 1998); *Rocor*, 77 S.W.2d at 261-62.[20]

---

[20]  In *Garcia*, the court explains (876 S.W.2d at 849):

"In *Ranger*, we stated that insurers have a duty of ordinary care that includes 'investigation, preparation for defense of the lawsuit, trial of the case and reasonable attempts to settle.'  723 S.W.2d at 659; *see also American Centennial*, 843 S.W.2d at 482, 485 (plurality and concurring opinions) (citing *Ranger* for standard of reasonableness in 'investigating, preparing to defend, trying or settling the third party action').  At the same time, however, the court noted that 'there is no contention that Ranger was negligent in investigation or trial of the Fitch/Eagle lawsuit.'  723 S.W.2d at 659.

. . .

In the context of a *Stowers* lawsuit, evidence concerning claims investigation, trial defense, and conduct during settlement negotiations is necessarily subsidiary to the ultimate issue of whether the claimant's demand was reasonable under the circumstances, such that an ordinarily prudent insurer would accept it. . . . the dissent relies on language in *Ranger* that is dictum. . . . [t]he *Stowers* remedy of shifting the risk of an excess judgment onto the insurer is inappropriate absent proof that the insurer was presented with a reasonable opportunity to prevent the excess judgment by settling within the applicable policy limits."

*Maryland Insurance* states "we now hold that Texas law recognizes only one tort duty in this context, that being the duty stated in *Stowers* . . . an insured is fully protected against his insurer's refusal to defend or mishandling of a third party claim by his contractual and *Stowers* rights."  *Maryland Insurance*, 938 S.W.2d at 28-29.  *Rocor* makes plain that a *Stowers* breach does not occur until the insurer negligently refuses a proper settlement demand within policy limits.  *Rocor*, 77 S.W.3d 261-62.  *State Farm Mutual* approves the above quoted language from *Garcia* and states that *Ranger's* broad language about the scope of the insurer's responsibilities was *dicta*."  *State Farm Mutual*, 980 S.W.2d at 628.  *State Farm Mutual* also holds that, contrary to other dicta in *Ranger*, "a liability insurer is not vicariously responsible for the conduct of an independent attorney it selects to defend an insured."  *Id*.  That holding, too, may undermine the *American Centennial* conclusion that there was evidence of a *Stowers* violation.

This court has relied on the above decisions to conclude that the broad language in *Ranger* has been limited by *Garcia* so that the *Stowers* duty is triggered only by a demand to settle within policy limits the insurer's refusal of which would be negligent and that "the *Stowers* duty is the only common law tort duty Texas currently recognizes in third party insurance claims."  *Ford v. Cimarron Insurance Co.*, 230 F.3d 828, 832 (5th Cir. 2000).  *See also St. Paul Fire & Marine Ins. Co. v. Convalescent Servs., Inc.*, 193 F.3d 340, 344 (5th Cir. 1999); *Travelers Indem. Co. v. Citgo Petroleum Corp.*, 166 F.3d 761, 764 (5th Cir. 1999).

It must also be noted that although *American Centennial* holds an excess insurer is subrogated to the insured's *Stowers* claim against the primary carrier which had taken full charge of but mishandled the defense of the case, it does not address such subrogation in favor of one of two co-primary insurers which has equally participated in the defense as against the other co-primary insurer likewise so participating. Here Liberty Mutual participated in the defense and was not without control of the litigation. Moreover, while Liberty Mutual had an applicable excess umbrella policy which funded $350,000 of the ultimate settlement, that fact alone would not seem to sustain the $550,000 judgment against Mid-Continent, at least not unless Liberty Mutual in its capacity as a co-primary insurer which had assumed defense was likewise also subrogated to a *Stowers* claim of the insured against Mid-Continent.

Finally, uncertainty about a *Stowers* duty on Mid-Continent's part to its insured Kinsel arises also from the fact that there was never any offer to settle within Mid-Continent's policy limits, whether viewed as $1 million or $700,000.[21] Mid-Continent was aware, however, that the plaintiffs had agreed to accept $1.5 million in full settlement of their claims against Kinsel, an

---

[21] At or before the settlement of the plaintiffs' claims against Kinsel, Mid-Continent paid $300,000 to settle the plaintiffs' claims against Crabtree, also its insured under the same policy. There has been no challenge to the reasonableness of that settlement. *See Texas Farmers Ins. Co. v. Soriano*, 881 S.W.2d 312 (Tex. 1994).

amount within the combined remaining limits of the Mid-Continent and Liberty Mutual primary policies, and that Liberty Mutual was willing and able to, and ultimately did, fund that settlement. Yet Mid-Continent would not contribute more than $150,000, although that amount was far less than its proportionate part and it could have contributed a total of $700,000 without exceeding its policy limits. This state of facts also presents the questions not addressed by Texas courts since left open as follows in *Garcia*, viz:

> ". . . insurers have no duty to accept over-the-limit demands. We do not reach the question of when, if ever, a *Stowers* duty may be triggered if an insured provides notice of his or her willingness to accept a reasonable demand above the policy limits, and to fund the settlement, such that the insurer's share of the settlement would remain within the policy limits. . . . Nor do we address the *Stowers* duty when a settlement requires funding from multiple insurers and no single insurer can fund the settlement within the limits that apply under its particular policy." *Id.*, 876 S.W.2d at 849 n.13.

In sum, although the recent decision in *General Agents* supports the district court's determination that, under its unchallenged factual findings, Mid-Continent violated a duty of unspecified origin to Liberty Mutual (either as equitable subrogee of their common insured, Kinsel, or otherwise) to contribute its proportionate part of the Kinsel settlement, of which Liberty Mutual had funded a disproportionately large amount, nevertheless the holding of *General Agents* in this respect appears to be *res nova* so far as concerns Texas law.

25

The question of whether any such duty on the part of Mid-Continent exists is a question of Texas law, determinative of the present suit, for if no such duty exists Liberty Mutual is entitled to no recovery.

Mid-Continent further argues in the alternative that even if there is some such duty on its part, it should not be deemed to have been breached merely because Mid-Continent may have been negligent in its assessment of the case against Kinsel as having a maximum settlement value of $300,000 and Liberty Mutual may have been reasonable in valuing the case against Kinsel at $1.5 million. Rather, according to Mid-Continent, any such duty on its part should be measured by the standard applied to suits against an insurer for breach of the duty of good faith and fair dealing in the denial of a *first* party claim under *Aranda v. Ins. Co. of North America*, 748 S.W.2d 210, 213 (Tex. 1988), which we have described as requiring the insured to "establish the absence of a reasonable basis for denying or delaying payment of the claim and that the insurer knew, or should have known that there was no reasonable basis . . . ." *Higginbotham v. State Farm Mut. Auto Ins. Co.*, 103 F.3d 456, 459 (5th Cir. 1997). We observe, however, that the Texas Supreme Court has subsequently abandoned the "no reasonable basis" formulation, and held that the trier of fact may determine that the insurer acted in bad faith if it "knew or should have known that it was reasonably clear that the claim was covered." *Universe Life*

26

*Ins. Co. v. Giles*, 950 S.W.2d 48, 54-56 (Tex. 1997). The *Giles* opinion makes plain that the insured's burden in the third party context under *Stowers* is *less* that than in a first party context under *Giles* (or *Aranda*), but it also makes plain that it has "declined to extend the bad-faith cause of action to the third party context." *Giles*, 950 S.W.2d at 53 n.2.

The question of whether the standard set forth in *General Agents* – essentially whether the insurer in Mid-Continent's position was unreasonable in its evaluation of the third party case (as well as whether the evaluation of the insurer in Liberty Mutual's position was reasonable) – is the appropriate one by which to measure whether Mid-Continent breached any duty it had to Liberty Mutual is likewise determinative, as the district court's findings and judgment here essentially rest on *General Agents*.

As to none of these related questions of law does there appear to be any controlling Texas Supreme Court precedent.

## IV.  QUESTIONS CERTIFIED

We accordingly hereby certify the following three determinative questions of law to the Supreme Court of Texas:

1.  Two insurers, providing the same insured applicable primary insurance liability coverage under policies with $1 million limits and standard provisions (one insurer also providing the insured coverage under a $10 million excess policy), cooperatively assume defense of the suit against their common insured, admitting

27

coverage. The insurer also issuing the excess policy procures an offer to settle for the reasonable amount of $1.5 million and demands that the other insurer contribute its proportionate part of that settlement, but the other insurer, unreasonably valuing the case at no more than $300,000, contributes only $150,000, although it could contribute as much as $700,000 without exceeding its remaining available policy limits. As a result, the case settles (without an actual trial) for $1.5 million funded $1.35 million by the insurer which also issued the excess policy and $150,000 by the other insurer.

In that situation is any actionable duty owed (directly or by subrogation to the insured's rights) to the insurer paying the $1.35 million by the underpaying insurer to reimburse the former respecting its payment of more than its proportionate part of the settlement?

2. If there is potentially such a duty, does it depend on the underpaying insurer having been negligent in its ultimate evaluation of the case as worth no more than $300,000, or does the duty depend on the underpaying insured's evaluation having been sufficiently wrongful to justify an action for breach of the duty of good faith and fair dealing for denial of a first party claim, or is the existence of the duty measured by some other standard?

3. If there is potentially such a duty, is it limited to a duty owed the overpaying insurer respecting the $350,000 it paid on the settlement under its excess policy?

28

We disclaim any intention or desire that the Supreme Court of Texas confine its reply to the precise form or scope of the questions certified.