[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-13567
Non-Argument Calendar
_____

D.C. Docket No. 4:16-cv-00338-HLM

UNITED STATES OF AMERICA,

Plaintiff - Appellant,

versus

EASEMENTS AND RIGHTS-OF-WAY OVER A TOTAL OF 15.66 ACRES OF
LAND,
MORE OR LESS, IN GORDON COUNTY, GEORGIA,
JAMES W. HOBGOOD,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(June 19, 2019)

Before ROSENBAUM, BRANCH, and JULIE CARNES, Circuit Judges.

PER CURIAM:

The Tennessee Valley Authority ("TVA"), a federally-owned corporation that acts as an agency or instrumentality of the United States[1], appeals the denial of its renewed motion for judgment as a matter of law after a jury awarded landowner James Hobgood $921,125 in "just compensation" for the taking of easements and rights of way to construct power lines on Hobgood's land in northern Georgia. After careful review, we affirm.

## I.

Hobgood is the fee simple owner of 374.28 acres of contiguous land west of the city of Calhoun in Gordon County, Georgia. This property consists of two undeveloped residential lots (5.83 total acres) and an adjacent agricultural tract (368.45 total acres). The agricultural tract (the "farm") is bounded on its western edge by the Oostananaula River and is bisected by the Beamer Bottom public road, with about 277 acres between the river and road and about 90 acres above the road. About 95 percent of the farm is in the floodplain, and it is unimproved except for an irrigation system. Hobgood has farmed the land since he purchased it in 1988.

In 2013, TVA announced a project to build a new 115-kV power line in Whitfield and Gordon Counties for the purpose of providing a second source of electric power to the cities of Calhoun and Dalton. The selected route was 20.5 miles long and crossed part of all three tracts of Hobgood's land.

---

[1] *Springer v. Bryant*, 897 F.2d 1085, 1089 (11th Cir. 1990).

2

On November 17, 2016, the "date of taking," TVA filed a complaint and "Declaration of Taking" to acquire permanent easements and rights-of-way (collectively, the "easements") totaling 15.66 acres of Hobgood's land.  With regard to the farm, the only tract of land at issue in this appeal, the easements condemned by TVA are 150 feet wide and cross 13.38 acres of the farm adjacent to or near some of its borders.  TVA has constructed transmission towers and power lines within the easements.

## II.

The district court set the matter for a jury trial for the sole purpose of determining just compensation.  Before trial, TVA moved to exclude several categories of testimony and evidence, including, as relevant here, Hobgood's post-taking plans to develop the farm into subdivided residential lots.  The court granted TVA's motion, finding that "any plans . . . to develop a subdivision were simply speculative as of the date of the taking."  TVA, however, did not move to exclude more general testimony from Hobgood's experts—a professional engineer and a real-estate appraiser—to the effect that the farm was suitable for future residential development and that this suitability affected its market value.

A three-day jury trial was held in May 2018.  The jury heard three different valuations of the amount of just compensation to be awarded—that is, the difference in the farm's value before and after the taking ("pre-take" and "post-take,"

3

respectively).   First, according to Marion Wilson, TVA's expert appraiser, just compensation was $68,435 based on a pre-take value of $1,842,250 and a post-take value of $1,773,815.  Second, according to Bruce Penn, Hobgood's expert appraiser, just compensation was $921,125 based on a pre-take value of $2,026,475 and a post-take value of $1,105,350.  Finally, Hobgood testified that the pre-take value of the farm—approximately $3,375,000—had been cut in half post-take.[2]

At the close of the evidence, TVA moved for judgment as a matter of law.  It argued that the evidence failed to support Penn's or Hobgood's valuation figures.  The district court denied that motion and submitted the case to the jury, which credited Penn's valuation and awarded $921,125 in compensation for the taking of easements on the farm.  The court then denied TVA's renewed motion for judgment as a matter of law, and this appeal followed.

## III.

We review *de novo* the denial of a motion for judgment as a matter of law, applying the same standards as the district court.  *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1173 (11th Cir. 2010).  Judgment as a matter of law is appropriate only when "the facts and inferences point so overwhelmingly in favor of one party

---

[2] Hobgood's total valuation of $3,497,500 included damages for the two residential lots, which he valued at a total of approximately $122,500.  Excluding damages for the residential lots results in the figure cited above—$3,375,000—which reflects Hobgood's approximate valuation of the farm.  TVA does not challenge the jury's award of $75,337.50 for the two residential lots.

4

that reasonable people could not arrive at a contrary verdict." *Id.* (citation, quotation marks, brackets, and ellipsis omitted). In making that determination, we review the entire record, but we draw all reasonable inferences in favor of the non-moving party and do not assume the jury's role of weighing the evidence or making credibility determinations. *Id.* We will credit evidence supporting the moving party that is uncontradicted and unimpeached, at least if it comes from disinterested witnesses, but "we will disregard all evidence favorable to the moving party that the jury is not required to believe." *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1312 (11th Cir. 2013) (quotation marks omitted).

## IV.

The Takings Clause of the Fifth Amendment prohibits the government from taking private property "without just compensation." U.S. Const. amend. V. ("[N]or shall private property be taken for public use, without just compensation."). "'[J]ust compensation' means the full monetary equivalent of the property taken." *United States v. Reynolds*, 397 U.S. 14, 16 (1970). In other words, "[t]he owner is to be put in the same position monetarily as he would have occupied if his property had not been taken." *Id.* In general terms, that means a landowner is entitled to "the fair market value of the property," which the owner bears the burden of proving. *Id.*

Fair market value is determined at the time of taking. *United States v. 320.0 Acres of Land, More or Less in the Cty. of Monroe ("320 Acres in Monroe County"),*

5

605 F.2d 762, 781 (5th Cir. 1979).[3]  In cases where the estate taken is less than absolute ownership, such as an easement, the compensation to be paid is "the difference between the fair market value of the land as a whole with and without the burden."  *United States for Use of Tenn. Valley Auth. v. Robertson*, 354 F.2d 877, 880 (5th Cir. 1966).

Fair market value includes "all elements of value that inhere in the property, but it does not exceed market value fairly determined."  *Olson v. United States*, 292 U.S. 246, 255 (1934).  Because a reasonable buyer "will purchase land with an eye to not only its existing use but to other potential uses as well," fair market value "includes any additional market value it may command because of the prospects for developing it to the 'highest and best use' for which it is suitable."  *320 Acres in Monroe County*, 605 F.2d at 781; *see Olson*, 292 U.S. at 255 ("The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered . . . to the full extent that the prospect of demand for such use affects the market value while the property is privately held.").

The highest and best use of property is presumed to be its current use.  *See Untied States v. 158.24 Acres of Land, More or Less, in Bee Cty., Texas ("158.24*

---

[3] This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

6

*Acres in Bee County")*, 515 F.2d 230, 233 (5th Cir. 1975). But landowners may prove, "if they can, that the actual use to which they are putting it is not the highest and best use for the property as viewed by a potential purchaser." *United States v. Buhler*, 305 F.2d 319, 328–29 (5th Cir. 1962).

When a landowner proposes a different use as "highest and best," the landowner must do more than show that the property is physically adaptable to that use. *Olson*, 292 U.S. at 256–57; *Cameron Dev. Co. v. United States*, 145 F.2d 209, 210 (5th Cir. 1944). In particular, the landowner must present evidence of a market for the proffered element of value. *See 158.24 Acres in Bee County*, 515 F.2d at 233 (concluding that there was no evidence of a "market" or "demand" for the landowner's proposed highest and best use); *Cameron Dev.*, 145 F.2d at 210. In other words, the landowner needs to show a reasonable probability that the proposed use will be needed and wanted at a near enough point in the future to affect the current value of the property. *320 Acres in Monroe County*, 605 F.2d at 817–18; *United States v. 69.1 Acres of Land, More or Less, Situated in Platt Springs Twp. ("69.1 Acres in Platt Springs")*, 942 F.2d 290, 294 (4th Cir. 1991); *see Olson*, 292 U.S. at 257 (speculative and remote uses "not fairly shown to be reasonably probable" should be excluded from consideration).

In terms of proving market value, "[c]ourts have consistently recognized that, in general, comparable sales constitute the best evidence of market value." *320*

*Acres in Monroe County*, 605 F.2d at 798; *see also United States ex rel. and for the Use of the Tenn. Valley Auth. v. Easement & Right of Way over a Tract of Land in Madison Cty., Tenn. ("Right of Way in Madison County")*, 405 F.3d 305, 308 (6th Cir. 1968) ("[E]vidence of sales of comparable property is persuasive evidence of market value, either as direct proof or in support of a witness's opinion."). Ordinarily, "[t]he extent of comparability goes to the weight rather than to the admissibility of the evidence." *Right of Way in Madison County*, 405 F.2d at 307.

## V.

We divide our discussion into three parts. First, we summarize the relevant evidence presented at trial. Second, we describe TVA's arguments on appeal. And third, we evaluate whether the evidence adequately supported the jury's award.

## A.

As noted above, the parties offered competing valuations from expert appraisers. But despite their differing results, both appraisers used the same basic analytical method for valuing the land: the "comparable sales" approach. This approach entails considering sales of similarly situated parcels and using those sales, with adjustments to account for any relevant differences, to evaluate the value of the subject property. *E.g.*, *Palmer Ranch Holdings Ltd. v. Comm'r of Internal Revenue*, 812 F.3d 982, 987 (11th Cir. 2016).

8

Wilson, TVA's expert, used comparable sales of agricultural property in the area to determine that the farm pre-take was worth $5,000 per acre, for a total of $1,842,250. After the taking, in Wilson's view, the value of 353 acres of the farm remained unchanged because that acreage could still be farmed without interference. Wilson opined that the highest and best use of the land both before and after the taking was its existing use as agricultural land. Wilson explained that it was zoned agricultural and that various features of the farm—that it was "predominantly floodplain land," "very flat and level," and had "access to year-round water and the possibility of irrigation"—made it "perfect for farming." As to the remaining 15 acres or so, Wilson found that the value of the acreage within the easements (13.38 acres) was damaged by 90% ($60,435), while the value of the acreage trapped between the easements and the property's eastern boundary (1.7 acres) was damaged by 80% ($8000). Accordingly, Wilson found that Hobgood was entitled to $68,435 in compensation for the taking.

Penn, Hobgood's expert appraiser, likewise used a comparable sales approach to value the farm as having a pre-taking value of $5,500 per acre and a total pre-take value of $2,026,475. Penn then used "paired sales analysis" to conclude that the presence of the power lines diminished the value of the farm by 45 percent; that the farm was worth $3,000 per acre after the taking; and that the property had a

9

diminished post-take value of $1,105,350. Using these values, Penn calculated the difference between the farm's pre-take value and its post-take value as $921,125.

Penn explained that "paired sales analysis" is a type of "trend analysis" that involves "look[ing] at the market" and comparing properties with and without power lines in the same area and seeing if there is "any difference in value per acre." Penn testified that he found enough comparable sales in Gordon County to "fe[el] satisfied that [he] could tell from a trend analysis what the market shows the potential difference in value would be to [the farm] with the power line on it." Penn stated that he had done a lot of similar "trend analyses and paired sales" based on 25 years of work for both power companies and property owners negotiating with power companies, and that his analysis in this case was consistent with his findings historically. "Simply put," according to Penn, "with the transmission line on the property now, it will sell for less than what it would before."

Penn, who had been a real estate appraiser since 1983, elaborated that the area of Gordon County where the farm was located was an "investor market" with people who "buy and sell land to hold and to resell." According to Penn, the farm pre-take was marketable to investors because floodplain in Gordon County—in contrast to other market areas—"provides premium value to a prospective buyer" and "tends to hold value" comparable to or higher than "high-end dry land."

10

But the power lines, in Penn's view, were a "blemish" that would cause potential purchasers to offer less or look elsewhere. He said that power lines, regardless of their placement on the property, cause the greatest loss in value to large, undeveloped tracts of land like the farm. Due to the presence of the power lines, according to Penn, the farm "lost the investor market" because the property was good for agriculture only. Penn stated that "[$]3,000 an acre basically demonstrates an agricultural use, an exclusive agricultural use, as opposed to the higher land prices you're seeing that investors are paying and people are paying for the expectation that something different will be used for the property."

Penn initially stated that the highest and best use of the farm pre-take was residential development "in the future." He later amended that opinion by stating that, at the time of taking, "[t]he highest and best use is for an investor to come and buy it." He explained that there were "a number of people that buy and sell tracts of land [in the area]." So his assessment of the pre-take value was not based solely on the farm's "residential value," even though he thought it was "natural to assume," due to other residential development in the area, that the farm "would likely go residential." He stated that his opinion had nothing to do with the feasibility of residential development, but rather what an investor would pay in the current market for "this property with riverfront, what he felt was a good price to pay with the expectation that the price would go up in the future."

11

The final valuation estimate came from Hobgood himself. Hobgood testified that the farm pre-take, based on "what [he] could do with it," was worth approximately $3,375,000.[4] Hobgood, who had lived in Gordon County nearly all his life and "fool[ed] with property all the time," testified that he bought the farm, like "any land [he] ever buy[s]," with a view to "what other potential it might have rather than just farming." Hobgood thought the farm would be ideal for cutting up into mini-farms "because people like a little land with their home, especially if it connects to the river." He stated that "people pay a big price for property that's abutted up to the river or stream." And in Hobgood's eyes, "there's not a prettier view in north Georgia than being on this farm and looking west. You've got a mountain range behind this and it's just a beautiful view."

Hobgood halved the pre-take value to arrive at a post-take value. He explained that, in his experience, power lines harm property values by an average of 50%. He elaborated that power lines affect the view, and that if the farm becomes "estate lots or mini farms," "you're looking directly at the power line, because most people are probably going to build a home up closer to the road," where the power lines are more visible. On cross-examination, Hobgood stated that he still had

---

[4] Hobgood's total pre-take valuation of $3,497,500 included the two residential lots that are not at issue in this appeal. With respect to the farm, Hobgood valued the 277 acres between the river and the road at $9,600 per acre and 60 of the 90 acres above the road at $12,000 per acre. He did not seek damages for 30 of the acres above the road, which he said were a "low area" where he might put in a lake or pond.

12

interest from people looking to buy the farm as a sod farm, and he believed he could sell it for more than $5,500 per acre.

Hobgood also called Karl Lutjens, a professional engineer, to offer testimony to the effect that the farm was suitable for residential development, despite being in the floodplain and zoned agricultural. According to Lutjens, there were no significant barriers to building houses on the farm.

As a rebuttal witness, TVA called Randy Saxon, who was hired by TVA to review Penn's work. Saxon testified to various deficiencies in Penn's analysis, including that Penn did not make any analysis of the housing market in Gordon County, such as "the current lot inventory of the county, absorption rates for lots, [and] absorption rates for houses." Further, Saxon testified that there was not a market for residential development at the time of taking because across the county there was a five- to six-year backlog of available residential lots on the market. With regard to Penn's post-take analysis, Saxon stated that Penn's "paired sale analysis" was improper and inconsistent with the standard for conducting that type of analysis. Contrary to Penn and consistent with Wilson, Saxon testified that the highest and best use of the property was its existing agricultural use. Saxon also addressed the studies on which Penn based his conclusion that the transmission line harmed the farm by 50%, stating that the studies did not support Penn's conclusion.

13

Finally, the jury saw an aerial photograph of Calhoun and the surrounding area, including the farm, a map of the property marked with the path of the easements, photographs of the property and the transmission towers and power lines, and information about the "comparable sales" used by the expert appraisers to evaluate the value of the farm.

**B.**

On appeal, TVA argues that Hobgood failed to overcome the presumption that the property's existing agricultural use was its highest and best use.[5]  In TVA's view, because Penn's valuation, which the jury adopted, was supposedly based on residential-development use, Hobgood was required to present evidence of a "market demand" for residential-development property.  Hobgood failed to meet this burden, according to TVA, because he failed to present any objective "market-analysis" evidence—such as a "market study"—supporting that use, and the only market-analysis evidence introduced at trial, through Saxon's testimony, showed that there was not a market demand for residential development property in the near

---

[5] TVA maintains that the district court should not have allowed the jury to consider a use other than agriculture because Hobgood failed to show that the farm was needed or likely to be needed in the reasonably near future for his proposed alternative use. *See 320 Acres in Madison Cty.*, 605 F.2d at 815 ("[T]he trial judge has the responsibility . . . to screen the proffered potential uses and exclude from jury consideration those which have not been demonstrated to be practicable and reasonably probable uses.").  But TVA did not move pretrial to exclude the testimony and evidence, of which it was fully aware, that it now claims should not have been admitted.  Nor did TVA object to the introduction of this evidence at trial.  Accordingly, we do not review whether the court abused its discretion by failing to exclude this evidence.  Nevertheless, we still must determine whether the trial evidence was legally sufficient to support the jury's award.

14

future.     TVA therefore asks that we conclude Hobgood failed to rebut the presumption that the highest and best use of the farm was its existing agricultural use and remand for entry of judgment based on Wilson's valuation (for an award of $68,435).

## C.

We agree with TVA that landowners must produce credible evidence demonstrating a reasonable probability that the proffered element of value will be needed and wanted at a near enough point in the future to affect the current value of the property.  *E.g.*, *320 Acres in Monroe County*, 605 F.2d at 781.  We also agree that proof of physical adaptability alone is not enough.  *See Olson*, 292 U.S. at 256–57.  But viewing the trial evidence and drawing all reasonable inferences in Hobgood's favor, we cannot say that Hobgood failed to meet his burden of proof as a matter of law.  *See Brown*, 597 F.3d at 1173.

As we see it, substantial evidence supports the jury's award of $921,125 in just compensation for TVA's taking of the easements on Hobgood's farm.  Hobgood proffered expert testimony from appraiser Bruce Penn that this amount represented the difference in fair market value of the whole tract before and after the taking.  *See Robertson*, 354 F.2d at 880.  Penn calculated the pre-take value of the farm at $5,500 per acre using comparable sales data.  He then conducted a "paired sales analysis" of properties in the same area with and without power lines to determine "what the

15

market shows the potential difference in value would be to [the farm] with the power line on it." Based on that analysis, which was consistent with the analysis he had performed in numerous other instances involving similar issues, he determined that the easements and power lines harmed the farm's value by nearly 50% and reduced the price per acre to $3,000.

Penn explained that the farm pre-take was desirable land from an investment or development standpoint. He testified that he was familiar with the area and that the farm was located in an "investor market" with several people who "buy and sell land to hold and to resell." He further testified that the farm pre-take was marketable to these investors because riverfront property in Gordon County "provides premium value to a prospective buyer" and is comparable in value to "high-end dry land." According to Penn, there had been other residential development in that same area, and in his view the farm would likely go residential in the future as well. He stated that his assessment of the pre-take value was based on what an investor would pay in the current market for "this property with riverfront, what he felt was a good price to pay with the expectation that the price would go up in the future." He further testified that the presence of the transmission towers and powers lines would cause potential purchasers to offer less or look elsewhere. *Cf. Right of Way in Madison County*, 405 F.2d at 309 (noting that certain segments of the buying public may

16

"remain apprehensive of these high voltage lines, and therefore might be unwilling to pay as much for the property as they otherwise would").

Hobgood likewise testified that he was actively involved in the real-estate market in Gordon County and that "people pay a big price for property that's abutted up to [a] river or stream." Hobgood also testified that the farm had beautiful views, and the jury saw pictures of the farm and the surrounding land. Additionally, Hobgood offered expert testimony to the effect that the farm was reasonably adaptable for residential development, despite being zoned agricultural and primarily floodplain.

TVA responds that this evidence is little more than proof of physical adaptability and suitability and that Hobgood failed to present any "objective" evidence substantiating Penn's market analysis. But TVA largely ignores Penn's testimony that he arrived at his pre-take and post-take valuations using comparable sales, which we and other courts have recognized are the "best evidence of market value." *320 Acres in Monroe County*, 605 F.2d at 798; *United States ex rel. Tenn. Valley Auth. v. 1.72 Acres of Land in Tenn. ("1.72 Acres in Tennessee")*, 821 F.3d 742, 757 (6th Cir. 2016). While TVA now contends that the comparable sales Penn used in his analysis do not actually support his conclusions, it did not move to exclude his testimony as unreliable or not based on sufficient facts or data. *See, e.g.*, Fed. R. Evid. 702 (governing the admissibility of expert testimony). And we find

17

that the extent of comparability was a matter for the jury to weigh. *See Right of Way in Madison County*, 405 F.2d at 307. Given that Penn was an expert appraiser with over 30 years of experience and familiarity with the Gordon County real-estate market, we see no reason why the jury could not have credited his testimony that, based on these comparable sales, the farm's fair market value at the time of the taking was $5,500 per acre based in part on its suitability for potential use for residential development. Likewise, the jury could have concluded based on his testimony—regarding "what the market shows the potential difference in value would be to [the farm] with the power line on it"—that the transmission line harmed the farm's value in the market and that it would sell for substantially less post-take.

We likewise reject TVA's argument that Penn's valuation was flawed because he did not review "market data[] to determine if there was a sufficient demand for residential property in Gordon County to support his opinion." While testimony from TVA's expert appraiser, Saxon, may have established that there was a backlog of available residential lots in Gordon County, that does not necessarily contradict or even undermine Penn's testimony that the investor market would have been interested in the farm pre-take for its development or resale potential. To begin with, not all property is created equal. The jury heard testimony that the farm had beautiful views and offered premium riverfront property, so it could have reasonably

18

concluded that the backlog of residential lots would not deter a reasonable purchaser interested in those elements of the land.

Moreover, as the Sixth Circuit has noted, there is a "substantial differential in value between farm land susceptible to future development and land already sold as a residential or commercial development." *Right of Way in Madison County*, 405 F.2d at 308. Penn valued the farm pre-take as a large tract of farmland with river frontage that was susceptible to future development; he did not calculate the value of the farm based on a hypothetical subdivision. While the farm may not have been in demand for residential use at the time of the taking, the jury was provided with enough evidence, construed in the light most favorable to Hobgood, to conclude that development was foreseeable and feasible enough that reasonable buyers would consider it in deciding what to pay for the property. *Cf. 69.1 Acres in Platt Springs*, 942 F.2d at 294 n.3 ("It is unimportant how far in the future the sand will actually be mined, so long as the mining is foreseeable and lucrative enough that reasonable buyers would consider it in deciding what to pay for the property."). In other words, "a reasonably minded trier of fact faithfully applying the law could find that [the farm's susceptibility to residential development] represents an element of fair market value." *320 Acres in Monroe Cty.*, 605 F.2d at 818.

The cases on which TVA relies are all distinguishable. In *1.72 Acres of Land in Tennessee*, the landowner's expert was not permitted to testify, and the landowner

19

himself offered no evidence beyond his own testimony about "what he thought were demand generators for a hotel." 821 F.3d at 755–56. Here, by contrast, Hobgood's expert appraiser, based on the "comparable sales" method, gave his opinion as to the difference between the farm's pre-take value and its post-take value.

Nor is this case like *United States v. 47.3096 Acres of Land in Oxford Township ("47.3096 Acres in Oxford Township")*, where the Sixth Circuit reversed a finding of just compensation that was based on an expert appraiser's valuation of farmland based on its hypothetical worth as a residential subdivision "via a 'lot method' of appraisal"—that is, "by estimating the number of lots and multiplying the amount by a fixed lot price." 583 F.2d 270, 272 (6th Cir. 1978). The court found that this evidence should not have been admitted because "there was no evidence of any current demand or potential for subdivisions in the neighborhood, or evidence that defendants had a plan to subdivide the property." *Id.* at 272. Unlike the expert in *47.3096 Acres in Oxford Township*, Penn did not value the farm via the lot method or as a residential subdivision. And Penn testified that there was demand in the investor market for property like Hobgood's farm at the time of the taking.

*United States v. 341.45 Acres of Land, More or Less, Located in St. Louis County ("341.45 Acres in St. Louis County")* is distinguishable for similar reasons. *See* 633 F.2d 108 (8th Cir. 1980). That case, like *47.3096 Acres in Oxford Township*, concerned the valuation of property—without road access—as a subdivision. *See*

20

*id.* at 112–13.  The case of *United States v. 1.604 Acres if Land, More or Less, Situate in City of Norfolk, Virginia.*, 844 F.Supp.2d 668, 679–81 (E.D. Va. 2011), concerning the feasibility of finishing the construction of a partially constructed tower, bears little resemblance to this case, so it is not persuasive.

Finally, TVA notes that Hobgood's own testimony reflects that he could have sold the farm for use as a sod farm for more than $5,500 per acre.  There was no additional evidence presented about this offer or potential use, however, and the fact that Hobgood may have received an oral offer to buy the farm by prospective sod farmers is of marginal relevance.  Because "[o]ral and not binding offers are so easily made and refused in a mere passing conversation, and under circumstances involving no responsibility on either side, . . . [they] cast no light upon the question of value." *Sharp v. United States*, 191 U.S. 341, 349 (1903).

Throughout its briefing, TVA makes a compelling argument that the evidence presented at trial would have supported a verdict in its favor.  But Hobgood's evidence of the fair market value of his land was not so remote or speculative that no reasonable jury faithfully applying the law could have returned an award in his favor.  And it is not our role to second-guess the jury's resolution of conflicting evidence or to reweigh the evidence ourselves.  *See Brown*, 597 F.3d at 1173.  Accordingly, we affirm the district court's denial of TVA's renewed motion for judgment as a matter of law.

21

**AFFIRMED.**